LITTLE ROCK SCHOOL
DISTRICT, Plaintiff,

v.

PULASKI COUNTY SPECIAL SCHOOL
DISTRICT NO. 1, et al., Defendants,

Mrs. Lorene Joshua, et al., Katherine
W. Knight, et al., Intervenors.

No. LR-C-82-866.

United States District Court,
E.D. Arkansas, W.D.

July 15, 1991.

Christopher Heller, Little Rock, Ark., for LRSD.

Samuel M. Jones, III, Wright, Lindsey & Jennings, Little Rock, Ark., for PCSSD.

Stephen W. Jones, Jack, Lyon & Jones, P.A., Little Rock, Ark., for NLRSD.

John W. Walker, John Walker, P.A., Little Rock, Ark., for Joshua intervenors.

Richard Roachell, Mitchell & Roachell, P.A., Little Rock, Ark., for Knight intervenors.

## MEMORANDUM AND ORDER

SUSAN WEBBER WRIGHT, District Judge.

The three districts and Joshua intervenors[1] ask the Court to reconsider its order of June 21, 1991, 769 F.Supp. 1483, in which the Court declined to accept a multitude of proposed changes to the settlement plans approved by the Eighth Circuit in *Little Rock School District v. Pulaski County Special School District No. 1*, 921 F.2d 1371 (8th Cir.1990). With one exception, the Court will let the order stand.

Contrary to the bleak picture painted by the parties' counsel, the Court did not consider and reject on the merits each and every proposed revision in the May 1, 1991 submissions [hereinafter May submissions]. Rather, the Court found that the revisions as a whole exceeded the bounds of permissible modifications outlined by the court of appeals. In order to focus the parties' efforts on bringing the settlement plans "up to date" after the lengthy hiatus during appeal, the Court withheld its approval of *any* revisions pending a resubmission of proposed changes pursuant to the terms of the June 21 order. *See Little Rock School District v. Pulaski County Special School District No. 1*, 769 F.Supp. 1483, 1489–1490, (E.D.Ark.1991). Those terms specified that any suggested alterations at this stage should be *transitional:* the parties may incorporate useful features of the Tri–District Plan or may make necessary adjustments to produce an appropriate fit between the future application of the plans and existing circumstances.

### I.

■ The parties object to the June 21 order because they "do not read the Court of Appeals' decision to limit substantive changes to either matters embraced by the Tri–District Plan or as necessary only to facilitate transition." Brief in Support of Motion to Reconsider at 2 [hereinafter Brief]. Indeed, the parties contend that the authority bestowed on them by the Eighth Circuit to alter the settlement plans "is *unqualified* except for the agreement of the parties, and, of course, the dictates of the Constitution." *Id.* (emphasis added). In other words, the parties may change the plans whenever and however they wish as long as they agree; the Court may not interfere unless the modifications are unconstitutional.

Close scrutiny of the court of appeals' opinion fails to divulge any endowment of such far-reaching proportion. In only two instances did the Eighth Circuit mention future modifications to the settlement plans. The court recognized that "[t]he parties may conclude that the Tri–District Plan contains useful ideas. They are free, by agreement, to *modify* the settlement plans *by incorporating in them one or more provisions of the Tri–District Plan*, subject, of course, to the approval of the District Court." *Id.* at 1393 n. 15 (emphasis added). The court also said the parties could make necessary transitional adjustments in certain details of the settlement plans.

---

**1.** The Knight intervenors did not join the other parties in the motion to reconsider. However, for convenience and unless otherwise specified, the three districts and the Joshua intervenors will be referred to in this order as "the parties."

The parties have been proceeding during this school year under the terms of our interim order filed on July 2, 1990. It may be necessary, *in order to make a smooth transition,* for the *details* of the settlement plans to be *adjusted* to produce an appropriate fit between their future application and existing circumstances. The parties should be able to agree as to whether any such *adjustments* are necessary, and, if so, what they should be. Absent such agreement, the District Court is authorized to take such actions as may be just.

*Id.* at 1394 (emphasis added). Incredibly, the parties suggest that it is this "transitional authority" which is "unqualified." Brief at 3. How the parties can construe language limiting changes to "adjustments" that are necessary, transitional, and fitting as an unfettered grant of authority is beyond comprehension. The court of appeals wisely provided a passage from one plan to another; it did not create an interminable tunnel.

Moreover, the language of the Eighth Circuit opinion anticipates only the possibility, not the surety, of changes in the settlement plans: "[i]t *may* be necessary ... for the details of the settlement plans to be adjusted.... The parties should be able to agree as to *whether any such adjustments are necessary,* and *if so,* what they should be." *Id.* (emphasis added). It is obvious that these words cannot fairly be read as authorizing extensive deletions or revisions in the plans.

The parties' insistence that their authority to change the plans is "unqualified" also conflicts with another Eighth Circuit decision, *Liddell v. Board of Educ. of the City of St. Louis,* 867 F.2d 1153 (8th Cir.1989). In *Liddell* a suburban school district reached an agreement with the other parties in the St. Louis school desegregation case that allowed it an additional three years to achieve its targeted percentage increase in black student enrollment under the court-approved settlement agreement. The district court determined that two rather than three years was sufficient time for the school district to attain the ratio required by the settlement agreement. The

school district argued on appeal that court approval of the extension agreement was not required and, even if it was, the district court lacked authority to reduce the length of the extension agreed to by the parties. In rejecting the school district's contentions, the court of appeals concluded that

as a part of its broad equitable powers in a court-supervised school desegregation case, the district court has authority to review, approve, and modify extensions of the Settlement Agreement previously entered into by the parties. In this instance, we find no abuse of discretion by the district court in modifying the ... extension agreement.

867 F.2d at 1155.

■ As the Seventh Circuit observed in *Armstrong v. Board of School Directors of Milwaukee,* 616 F.2d 305, 313 (7th Cir. 1980), the overriding public interest in favor of settlement must be balanced against "strong countervailing public policies which counsel against automatic judicial acceptance of such agreements." The court must be concerned about safeguarding the rights of class members who are not involved in the settlement negotiations nor present to voice their views in court. Additionally, in civil rights cases such as this, the effects of a settlement extend far beyond individual class members. The interest of the public as a whole must be considered, since "[t]he substantive issues involved in many class actions reflect a broad public interest in the rights to be vindicated or the social or economic policies established." *Id.* at 313. This is why approval of a settlement agreement should be given only where the court finds the settlement fair, reasonable, and adequate. *Id.* (citing *Grunin v. International House of Pancakes,* 513 F.2d 114, 123 (8th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975)). Likewise, the Eighth Circuit said in its December 12, 1990 opinion that

[t]his does not mean that a court must automatically approve anything the parties set before it. In the present case, for example, any remedy will necessarily require some judicial supervision—monitoring, at least—for a long time. A

court has a strong interest in not involving itself, along with the prestige of the law, in an ongoing equitable decree which is either manifestly unworkable or plainly unconstitutional on its face. In addition, this is a class action, and courts are not obliged (indeed, they are not permitted) to approve settlements that are unfair to class members, or negotiated by inadequate class representatives.

921 F.2d at 1383. No less a standard should apply to a court's review of proposed modifications of such agreements.

In the alternative, the parties suggest that they have simply availed themselves of the court-approved amendment process set forth in the Pulaski County Special School District (PCSSD) plan. While they dispute the Court's understanding of the process, *see infra*, they now submit (after the fact) that "any changes they have proposed that are not embraced by either the Tri–District Plan or the transitional authority are products of this amendment process." Brief at 5. As discussed in its June 21, 1991 order, the Court views this amendment process as a vital means of ensuring sufficient flexibility in the plans for responding to changing conditions and unforeseen developments. However, the process can be abused, especially if it is invoked to justify creating a set of plans materially different from those approved by the Eighth Circuit. The parties admit the importance of preserving the language of the *original* settlement plans: "These steps [in organizing the NLRSD plan into a single document] were taken to minimize the amount of editorial change and to retain as much of the original language as possible since that is the language approved by this Court and the Court of Appeals" (NLRSD May submission, p. 905). But their actions speak louder than their words—the proposed revisions include literally hundreds of alterations to the court-approved plans.

■ The controversy at hand underscores the different perspectives held by the Court and the parties as to the settlement plans. The Court sees the Eighth Circuit's approval of the plans as akin to establishing a benchmark; we now have distinct reference point, a sure guide for ending this dispute and getting the parties out of court. Some revisions to the settlement plans will be needed initially to update the plans and to effect a smooth transition from the Tri–District Plan; thereafter, other modifications may be necessary in response to changing conditions and unforseen developments. However, such changes should be minimal and occur at the margins, rather than at the core of the plans.

The three districts and Joshua intervenors apparently have taken a different view of the settlement arrangement. They see the plans as fluid, open to continual and considerable revision as long as the parties agree and the changes are not facially unconstitutional. If major components of the plans cannot be implemented due to a lack of time, money, or foresight (as is the justification for many of the now proposed revisions), the parties argue that they simply can agree to change their plans, subject, of course, to whatever concessions necessary to secure such an agreement.

This approach presupposes a world without detailed, court-approved settlement plans. The Eighth Circuit did not endorse merely an "agreement to agree," but rather a comprehensive *solution* to the desegregation case with room for adjustments at the margins. What the parties propose will keep the settlement plans in a constant state of flux and encourage perpetual negotiation and posturing by the attorneys in this case, rather than focusing the energies of the three districts on *working* the plans they fought so hard for on appeal. After all, why have settlement plans if they don't "settle" anything?

To ensure that their efforts are constitutional, the districts must stay within the parameters of the already-approved settlement plans, or they must present each proposed change to the Court for review. Minor adjustments are to be expected; considerable material revisions, however, merely will prolong this litigation, thus frustrating the hope expressed by the Eighth Circuit in approving the plans.

The action we take today can lead to a period of calm in this case, perhaps even bringing the parties a happy issue out of their afflictions. Whether this will occur rests largely in the parties' hands. If they scrupulously and diligently carry out the settlement plans ... and if there is no major unforseen change in circumstances, they should be able to devote more energy to education, and less to litigation.

921 F.2d at 1394. This period of calm and stability, heretofore elusive, will never be realized if the parties are allowed to renegotiate the plans *ad infinitum.*

When settlement agreements are submitted to a court for initial approval, the court " 'may suggest modifications, but ultimately, it must consider the proposal as a whole and as submitted. Approval must then be given or withheld.' " *Id.* at 1388 (quoting *Officers for Justice v. Civil Service Commission,* 688 F.2d 615, 630 (9th Cir.1982), *cert. denied,* 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983)). Proposed modifications in the details of an approved settlement agreement also must be reviewed in the context of the agreement as a whole. However, if the suggested changes are extensive, the context itself is altered, and the court no longer has established reference points by which to evaluate the fairness, reasonableness, and adequacy of each revision. In addition, the court must decide whether such changes render the entire agreement unconstitutional. There is little difference between allowing the parties in this case to make sweeping modifications of the plans and crafting a new settlement agreement. This is particularly troubling since one of the parties to the original settlement negotiations, the State of Arkansas, has been dismissed from the case. Even if the parties have not fashioned a new agreement, should they now be permitted to alter extensively the plans without the interests of the State being represented in the negotiating process?

The view espoused by the parties also would make it difficult, if not impossible, for the Court to carry out effectively its mandate to monitor the parties' compliance with the plans to ensure that the plans are "scrupulously adhered to." 921 F.2d at 1386. Such monitoring is "a necessary condition of [the court of appeals'] holding that the [settlement] plans are not facially unconstitutional." *Id.* at 1388. As with a surveyor, the contours of the districts' compliance with the plans cannot be carefully monitored with any accuracy or precision if the benchmark is continually being moved. For the Office of Desegregation Monitoring (ODM) to construct necessary accountabilities and performance indicators, the plans must remain relatively constant and stable. Plans which cannot be monitored also cannot be enforced.

Does this mean that the parties cannot agree to do more to promote desegregation in the three districts? Of course not. However, there is no requirement that such efforts be written into the settlement plans. The plans are a floor, not a ceiling. In this respect, the Court agrees with the parties' observation in the footnote on page 15 of their brief:

Each district's settlement plan reflects the *minimum* it must do, not the maximum. The districts are free to add programs above this minimum threshold provided only that they do not conflict with the parties' settlement plans nor otherwise undermine the districts' constitutional obligations.

The Court is concerned that the parties simply do not keep rebuilding the floor, and end up doing less under the guise of doing more.

The settlement plans represent what the parties *themselves* agreed to do in order to bring this litigation to an end. The court of appeals reviewed all four plans and concluded that they are "reasonable, good-faith efforts to solve seemingly intractable problems ... [embodying] significant relief for the plaintiff class," *id.,* and provide a "constitutionally accepted level of relief," *id.* at 1390. Accordingly, this Court was instructed to approve the settlement plans "as submitted by the parties," *id.* at 1376, and to "monitor closely" the parties' compliance with the plans, *id.* at 1394. The Court believes that the plans are not and

should not be subject to substantial alteration, especially when the parties apparently have made little effort to implement many of the provisions they now want to change. Again, it must be emphasized that each commitment the parties now want to revise or delete, they *themselves* conceived. Not only that, but the parties devoted much effort to persuading the court of appeals to approve *their* plans over the Tri–District Plan developed by the Metropolitan Supervisor. Yet, with reference to incorporating parts of the Tri–District Plan into the PCSSD's plan, they *now* tell the Court that "[s]ince the Tri–District Plan itself is so similar to the settlement plan, there is very little to incorporate." Stipulation of Facts at 3 [hereinafter Stipulation]. How can the parties' attorneys justify the time and money spent on appeal in light of such a claim?

## II.

The parties suggest that the instructions given by the Court at a hearing on January 7, 1991 led them to believe that they could submit such far-reaching modifications for the Court's approval. Several remarks from this hearing are quoted in their brief. From these, the parties argue that they understood, among other things, that they could "produce leaner documents by eliminating redundancies and other matters initially included for different reasons," Brief at 11, and that "significant text might be deleted as part of this process," *id.*

The only exchange between the Court and counsel that relates to these two assertions is found at page 30, lines 8–22 of the hearing transcript, and is reproduced in full as follows:

> MR. SAM JONES: One thing we've all discussed, we—and we'll probably be dead wrong on this, but right now we think that once we distill all these and combine them that we'll take out a whole lot of stuff that's in the four plans now that was there for reasons we need not get into now, but they will be leaner documents. And I'm sitting here now trying to figure out how you want— Do you want us to cross-reference omissions from things that are—

THE COURT: Yes, I do.

MR. SAM JONES: Okay.

THE COURT: If you're omitting something, say, "We omit from pages 3 to 18 of the plan as proposed on such and such a date or as approved on such and such a date." I mean, and—but do that. I mean, be as specific as you can be.

In their brief, the parties failed to mention Mr. Jones' question at the end of his comments, thus quoting the Court's reply out of context. The Court merely was responding to this question when it illustratively referred to omitting certain pages from the plan. No mention was made of eliminating "redundancies" and "other matters initially included for different reasons" (which would include just about *anything*), nor did the Court anywhere authorize the deletion of "significant text."

What is clear from the transcript of the hearing is that the Court instructed the parties to submit their proposed revisions in a *single* document *signed* by *all* parties. For example, at page 7, lines 22–25, the Court indicates that "I want a document in which you have different chapters—North Little Rock's plan, interdistrict's plan, the Little Rock School District's plan. I want you all to sign the modification." *See also* Transcript of Hearing on Grant Proposal at 6, 8, 11–12, 15 [hereinafter Transcript]. The mandate was to consolidate, not to condense.

One reason the Court wants the plans compiled into a single document was underscored by counsel for the Joshua intervenors in remarks made at the hearing:

> I would think that ultimately what [the Court] would want and what we and the community would want would be, as you say, a single document so that every citizen in the community would be able to go to a single document and say that this is supposed to be done and this is the expectation of the plan by time certain.

Transcript at 11. The parties say they understood "that the Court's principal concern was to produce a single document agreed to by the parties that would be easier to utilize than the 1989 versions of the plans." Brief at 11. However, on May

1, 1991, the proposed modifications were filed in separate documents, none of which were signed by all the parties. Why the parties completely disregarded the Court's instructions on this matter is puzzling, especially when they knew that the submission of a single document signed by everyone was a "principal concern" of the Court. This fact alone would justify requiring the parties to resubmit their proposed revisions in proper form.

Possibly the reason why the three districts and Joshua intervenors failed to submit a document signed by *all* the parties to this litigation is that the Knight intervenors objected to certain revisions in the Little Rock School District (LRSD) plan. The districts and Joshua apparently either forgot or ignored this when they wrote in their brief that "the parties all agreed to the changes proposed in the Modified Plans. Accordingly, there is agreement and no dispute for this Court to referee among the parties." Brief at 2.

Certain suggested modifications squarely impact the teachers. For example, on page 716 of the PCSSD's May submission, new language specifies that

> [i]n an effort to maintain stability within the schools, school districts will not employ personnel from the other respective school district [sic?] during the thirty (30) days prior to the reporting date for teachers of the releasing school district. The only exception to this agreement would be to allow an employee to accept a promotional position within another school district. The time frame for release of an employee for promotional purposes must be mutually agreeable to both districts may vary [sic] from case to case.

Aside from the fact that this revision apparently is more than transitional, the Court, in reviewing the documents, has no way of knowing if the Knight intervenors agreed to such a provision absent their signature.

One final observation about the Court's remarks at the hearing: the Court used the terms "final modified settlement agreement" or "final document" when referring to the revised plans. *See* Transcript at 6, 15. Clearly, the Court at that time did not view the settlement plans as something fluid, subject to constant negotiation and change.

### III.

The parties claim that the Court has modified the settlement agreement by requiring use of the amendment process set forth in the PCSSD plan (9 App. 2049–50) [2] for future modifications to the any of the three individual district plans. On the contrary, the Court merely has implied the terms of the amendment process in the PCSSD plan—a process which the parties *themselves* created—in both the LRSD and NLRSD plans. Apart from such a reading, there is *no* mechanism in either the LRSD or NLRSD plans for amendment. There is nothing to indicate that the parties would intend a *different* process to apply to the these two plans.

Also disputed is the Court's interpretation of the PCSSD amendment process as not requiring agreement of all the parties for amendment.

> The Court, we respectfully submit, mistakes the intent of the parties. That intent is simply to have all proposed changes in either plan submitted to all the parties first. If they reach agreement, then the proposed changes are submitted to the board or boards for approval. Upon approval, a formal document is formally submitted to all parties for signature and then submitted to the Court. Upon disapproval by either party the proposal then is subject to further discussion between the parties in an effort to reach a new agreement. Upon agreement the proposal is resubmitted to the board or boards for consideration. Upon approval by all the parties a formal document is then submitted to the Court.

---

**2.** For convenience, this citation is to the Appellants' Joint Appendix filed with the Eighth Circuit. The full text of the amendment process is set forth in Exhibit A to this order. The original language was virtually unchanged in the PCSSD's May submission.

That is the procedure which the parties have followed to date. It is also their understanding of the manner in which the parties will proceed in the future, subject, of course, to court approval.

Brief at 4. Under this version, a district cannot submit an amendment unilaterally to the Court for approval until the agreement process completely breaks down.

What the parties now claim is their "intent" is far different from the procedure outlined in the PCSSD plan. The *only* instance where the "agreement" of the parties is mentioned is in reference to the *initial* suggestion of possible amendments: "Proposed amendments may arise in multiple ways, including: ... I. By agreement or consultation among neighboring districts and/or with other parties" (9 App. 2049). Note that this is not the exclusive method by which such amendments may arise, nor is agreement among the parties even required (consultation will suffice). Moreover, the approach the parties now suggest was their intention all along directly conflicts with the provisions in step three requiring only that "[i]nformal contact and consultation with relevant litigative parties should also be had when and to the extent appropriate from this point forward in the process," and in step six directing that the proposed amendment only be "formally submitted" to other litigative parties upon approval by the district's school board. The interpretive approach used here by the attorneys brings to mind a conversation between two characters in Lewis Carroll's classic, *Through the Looking Glass.*

"There's glory for you!" [said Humpty Dumpty].

"I don't know what you mean by 'glory,'" Alice said.

Humpty Dumpty smiled contemptuously. "Of course you don't—till I tell you. I meant there's a nice knock-down argument for you!"

"But 'glory' doesn't mean a 'nice knock-down argument,'" Alice objected.

"When *I* use a word," Humpty Dumpty said, in a rather scornful tone, "it means just what I choose it to mean—neither more nor less."

"The question is," said Alice, "whether you *can* make words mean so many different things."

"The question is," said Humpty Dumpty, "which is to be master—that's all."

It is counsel for the parties, not the Court, who are "modifying" the unambiguous terms of the settlement plans by their actions. As stated in the June 21 order, the PCSSD amendment process, designed by the parties themselves, wisely places on each individual school district the responsibility for modification of its own settlement plan, subject to Court approval, rather than involving all of the parties in constant negotiations and posturing whenever a change or refinement in one of the plans is needed. It appears that counsel in this case would have it otherwise. Even *after* the settlement plans were approved by the Eighth Circuit, one attorney commented, "I think that there are so many things that remain to be done and so many unanswered questions [that] we need at least several months [to negotiate further changes]." Transcript at 8.

This amendment process will not result in greater "control" over the school districts by the Court. On the contrary, the major responsibility for future amendment will fall on each school district, its board and patrons. It must be emphasized that this amendment process is not something the Court has created and forced upon the parties—rather, it was written and agreed to *by the parties themselves.*

### IV.

While the merits of transitional revisions will be considered more fully at a hearing subsequent to the parties' compliance with the terms of the June 21 order, the Court will address briefly some of the explanations included in the parties' Stipulation of Facts for the changes they have proposed. Since there are literally hundreds of proposed changes, the concerns expressed below are illustrative, rather than exhaustive.

### 1. *PCSSD Proposed Revisions*

The parties agreed that "outdated material, matters of historical interest only, requirements otherwise imposed by state or federal statute or regulation, and other items, while important to the general educational process, but not directly required to desegregate" should be removed from the plan. Stipulation at 1–2. They also sought to correct "mistakes in the plan, particularly in areas that were not directly addressed by the Eighth Circuit opinion." *Id.* at 2.

What the parties call "matters of historical interest" often provide a context for properly understanding various obligations under the plan, especially when monitoring the parties' faithfulness to those commitments. Determining what fits in the broad "other items" category is a matter of judgment. Previously, the parties considered such information important to desegregation—why else did they include it in the original plan? Now they want it deleted. The same question can be asked about the requirements imposed by statute or regulation. The parties also claim to have corrected "mistakes" in the plan; however, nothing has been identified as such, either in the May submissions or the present stipulations. Obviously, the scope of these revisions suggests a major rewriting of the plan.

The parties admit to eliminating "timelines" for matters which are *"ongoing* and *routine,"* because, in their view, "basic commitments and requirements were sufficient to guarantee that *the matters promised and ordered would be done." Id.* (emphasis added). If these matters have been promised, but not yet performed fully, then timelines are imperative to guiding and monitoring the fulfillment of such commitments.

Information deleted from the library media section (pp. 751–56)[3] sets the context for present expectations, and subsections dealing with planning, personnel, definition of library media roles, staff development plans, desegregation research, facilities/resources, excellence indicators, and evalua-

tion procedures are not included elsewhere in the plan. Yet the parties claim that "the library media program has not been reduced." *Id.* at 4. If this information "had no direct impact on desegregation commitments," as the parties now contend, why was it included in the settlement plans reviewed and approved by the Eighth Circuit?

The central office review of special education referrals (p. 772) has been discarded because "[s]taff reductions in the special education department made it *impractical* to implement this additional procedure." *Id.* (emphasis added). That the present review process may exceed the requirements of federal statutes is beside the point; the parties agreed to *more stringent* commitments under the settlement plan to eliminate segregation. This is simply a case of the tail wagging the dog: staffing now defines the plan, rather than the plan defining staffing. Should court-approved desegregation obligations now be relaxed simply because they are impractical?

The parties claim that "most" of the provisions deleted from the section on student discipline (pp. 804–08) appear elsewhere in the plan. While that may be true, these commitments are neither set in the context of, nor relate to, the analysis of factors affecting student discipline, particularly the problem of black students being disciplined disproportionately. The parties still have narrowed the target areas for disproportionate discipline analysis from five to three.

The reduction of the secondary curriculum coordinators is "due to the well-publicized financial condition of PCSSD." *Id.* at 6. While the PCSSD's financial woes may be "well-publicized," nothing has been presented to the Court describing these problems. Moreover, the parties' desegregation obligations under the settlement plans do not depend on whether they have the necessary funding. This principle was stated by the court of appeals with refer-

**3.** Page numbers cited in parentheses are from the May submissions.

ence to the settlement proceeds paid by the State to the districts:

> Under the settlement plans, the districts assume certain unconditional obligations. These obligations are not dependent upon payments by the State. Whether the State makes the payments required by the settlement agreement or not, and whether these payments are adequate to fund the districts' desegregation obligations or not, these obligations remain binding.

921 F.2d at 1390.

Incredibly, the parties suggest that "[t]he number of coordinators was not intended as a component of the desegregation plan." Stipulation at 6. In other words, although the plan originally reads "[c]ompleting the staff of the Division of Instruction are *thirteen* secondary curriculum coordinators representing the various disciplines" (9 App. 1353, emphasis added), they didn't *mean* they were going to keep that number of curriculum coordinators. If a certain number was not intended as a component of the plan, why then do they propose to *change* the number from thirteen to six?

The PATWICK program purportedly was discontinued due to a lack of parental concern. The parties state that "[t]he parent centers were set up as *an alternative* to the PATWICK program at the recommendation of Mr. Reville." *Id.* at 7 (emphasis added). However, the Tri–District Plan, written by the Metropolitan Supervisor, cites *both* PATWICK *and* the parent centers as promoting parental involvement in district schools. *See* Tri–District Desegregation Plan, "Monitoring" Section at 12, 22–23 [DOC # 1291], *Little Rock School District v. Pulaski County Special School District*, No. 82–866 (E.D.Ark.).

The commitment that secondary school counselors would establish committees composed of students, parents, and teachers to address the problems of teenage pregnancy, drug addiction, and divorce/stepfamilies is dropped because "[a]s matters developed, the counselors did not have *ample time* to address these issues." *Id.* (emphasis added). Since counselors ap-

parently are responsible for dealing with the psychological and sociological needs of students, it is difficult to understand why they wouldn't have time to address issues of teenage pregnancy, drug addition, and divorce/stepfamilies.

Other exclusions are justified because "a program is in place" or because the district is "in compliance" with relevant guidelines (see pp. 7–10). Present performance does not excuse future obligation. What if the district *stops* doing what it promised? Without such commitments remaining readily identifiable in the plan, the Court cannot monitor district's compliance with the plan.

The parties refer to the Joshua Agreement in the settlement plan, but propose to delete it as an exhibit to the plan because "it seemed unnecessary to continue its retention." *Id.* at 9. Even though the vitality of the Agreement is not altered by it not being included as an exhibit, such an omission is inconsistent with the purpose for consolidating the four settlement plans into one document. This purpose, as already noted, was emphasized by counsel for the Joshua intervenors at the hearing:

> I would think that ultimately what [the Court] would want and what we and the community would want would be, as you say, a single document so that every citizen in the community would be able to go to a single document and say that this is supposed to be done and this is the expectation of the plan by time certain.

Transcript at 11.

The parties list numerous other changes proposed for the modified plan, and indicate they fall into two categories: (1) revisions calculated to enhance the desegregation process, and (2) items which reflect changed circumstances (see pp. 10–17). A closer look, however, reveals that many of these changes add little if anything substantively to the plans; others, while not of constitutional proportions, potentially could create more problems than they might solve. Two examples will illustrate. One alteration purports to commit the PCSSD to equal facilities: "Facilities will be maintained so that they are clean, safe, attrac-

tive, *and equal*" (p. 705, added language in italics; the word "safe" also does not appear in the original settlement plan, but has been added without being identified as such). Equal in what way? Size? Square footage of the library or computer labs or the teachers' lounge? The amount of playground equipment? The number of volumes in the library?

The parties have added what they call "objective criteria" for the disciplining of children. This criteria requires discipline "which is related to the educational objective and does not treat children more harshly than adults subjected to criminal laws" (p. 712). This must speak for itself, but what is it saying? Surely not that we can treat children *as* harshly, or *almost* as harshly, as adults subjected to criminal laws. Or, does it mean that school administrators must afford students accused of rule violations the full measure of due process afforded adults accused of crimes?

The list of "Comments and Explanations," Stipulation at 11–17, is far from a complete accounting for the litany of plan alterations. The revised plan contains numerous deletions, additions, reorganizations, and other changes of various sorts not included in the parties' explanatory list. For example, no explanation is given for a curious change in verb tense from present to future in this sentence: "Every precaution *shall be* taken to eliminate racially identifiable classes" (p. 717, change in italics). Has the tense been changed because precautions to eliminate racially identifiable classes have not or are not now being taken, but will be sometime in the future? In which of the above two categories would the parties place this alteration? It certainly does not qualify as an "enhancement" of the desegregation process. Since the Tri–District Plan required the PCSSD to eliminate one-race classes by the beginning of the 1990–91 school year, the Court wonders what circumstances have "changed" necessitating this alteration.

### 2. LRSD and Interdistrict Proposed Revisions

Unlike the approach taken with the PCSSD plan, the parties attempt to explain only those changes in the LRSD plan cited in the June 21 order. Again, a few examples will illustrate the Court's concern.

The LRSD proposes to reduce the number of instructional aides in incentive schools from one per classroom to two aides for every three classrooms. The original settlement plan provided for an extra adult "*in* every classroom" as a full-time instructional aide (10 App. 2267–68) (emphasis added). It never was envisioned that they would spend their time supervising activities outside the classroom; on the contrary, the focus of their responsibility was *instructional* in nature. *See* 10 App. 2268. It does not follow, then, that since "[t]he 1989 plan made no provision for supervision aides ... instructional aides were required to perform supervision duties outside the classroom." Stipulation at 18. If the LRSD has inadequate personnel to fulfill its obligations under the plan, they have the latitude as well as the responsibility to hire additional staff. No matter how the parties characterize it, they are still retreating from their original commitment.

Elimination of school themes and program specialists in the incentive schools is also proposed by the LRSD. Their explanation is conclusory; it sheds little light on *why* plans for such themes were dropped in the May submission, especially after the LRSD apparently expended considerable money to purchase equipment and materials to support specialized themes such as mass media and the environment.

Under the Academic Programs section of the LRSD plan, twenty four general areas for implementation are described (10 App. 2238–40). The parties propose to add timelines for two of these areas, parent home study guides and computer managed instructional technology, contending that such requirements guarantee that these items will be developed in accordance with a reasonable schedule. *See* Stipulation at 19–20. However, no timelines are supplied for the remaining items on the list. Why add deadlines for only these two?

The parties also suggest that retaining science and social studies in the LRSD's

academic support programs would "dilute" such programs and run the risk of increased "resegregation." *Id.* at 22. The Court does not follow the parties' reasoning here. Educators are responsible for teaching children in *all* academic areas, especially in those subjects on which students routinely are tested. An appropriate level of concentrated efforts in all the core subjects should prevent diluted results.

Even though the parties emphasize the value of using four-year-old programs at *selected* schools (not *all* schools as originally agreed), they fail to include any timelines for the implementation of such programs regardless of the specific sites. As the parties pointed out earlier, deadlines "guarantee" that these programs "will be developed" in accordance with a reasonable schedule.

Still absent is information the Court specifically requested in its order dated March 21, 1991 concerning plans for school capacity expansion. The parties indicate that the LRSD notified the Desegregation Monitor on May 30, 1991 of its intention to proceed with asbestos removal and demolition of the building which presently occupies the site on which King will be constructed. *Id.* at 26. However, the Court does not consider the Monitor being "carbon copied" on a brief letter between counsel referring to an unnamed interdistrict school as adequate notification of the parties' decision on this matter. *See* Exhibit B to this order.

There are numerous other changes proposed in the LRSD plan for which no explanation is offered and which do not appear to lie within the scope of transitional changes authorized by the court of appeals. For example: (1) deleting a guarantee that extended year summer options would be at no cost for incentive school students (p. 298); (2) removing a provision that Explorer [scout] post access/membership would be available for incentive school students (p. 300); (3) deleting Saturday programs "at each [incentive] school site" (p. 308); (4) revising the commitment to recognize parents and a community person each month at incentive school PTA meetings (p. 348); (5) eliminating the promise to provide school lunch vouchers and other awards as part of incentive school parent/community recognition, as well as involving students in the process of selecting the award winners (p. 349); (6) no longer requiring parents to call the school to report their child's absences, nor requiring that the school call the home and document reasons for absences (p. 351); (7) narrowing the purpose of incentive school recruitment programs to encourage voluntary assignments for the kindergarten level only (p. 358); (8) distributing literature which highlights the incentive school program to a more limited group of parents (p. 360); (9) excising a provision to request a special designation from the Arkansas Department of Education to be used in marketing incentive schools (p. 360); (10) eliminating a provision to hire two parent recruiters to conduct recruitment activities for the incentive schools (p. 360); (11) lining-out virtually the entire section on computerized transportation and completely deleting the data processing section, prefacing the removal with the terse notation "[d]elete all, no replacement" (p. 376–80); (12) cutting historical information on a multi-ethnic materials fair (p. 96); (13) deleting the requirement that elementary curriculum reflect a multi-ethnic approach (p. 96); (14) pushing back the date by which secondary curriculum will reflect a multicultural approach (p. 96); (15) omitting the requirement to add a section on multi-ethnic curriculum to the LRSD monitoring checklist (p. 97); (16) lining-out the charted implementation timelines for multicultural curriculum with the notation "all completed" (pp. 102–07); (17) eliminating Russian as a language option at Parkview Magnet (pp. 138–39, 141–42, 147); (18) removing specialized provisions by deleting the sections on Parkview's staff development and physical facilities (p. 143); (19) dropping the provision to coordinate the recruitment of private school students to magnet schools with the Magnet Review Committee (p. 151); (20) removing (perhaps without the knowledge and approval of a former party to this case, the State of Arkansas) a provision that calls for the Arkansas Department of Education and LRSD to work together to secure fed-

eral funds (p. 152); (21) adjusting the target racial balance at Dunbar Junior High Magnet to 60 percent black and 40 percent white (p. 229), while the Interdistrict Plan requires that interdistrict schools seek a ratio of between 60 percent and 40 percent of either race with the ideal goal of 50 percent black and 50 percent white (p. 384).

At least some of the new language in the proposed LRSD plan was taken from the Tri–District Plan. However, the lack of cross-references (which did appear in much of the PCSSD proposed revision), hampered efforts to compare the alterations with documents of record. The parties were instructed to include such cross-references in their submissions. *See* Transcript at 6, 30.

The Interdistrict Plan also was presented with few explanations for the desired changes. To illustrate: (1) parents are no longer to have a voice in the location of themes they help identify for interdistrict schools (p. 393); (2) a survey process and procedures schedule will not be prepared for "those interdistrict schools coming on line subsequent to the 89–90 school year" (p. 394); (3) there is no longer a deadline for conducting parent meetings to determine the theme for Romine (p. 397); (4) references to an alternative school in NLRSD no longer remain (p. 400); (5) the February 1989 petition to modify the NLRSD plan no longer speaks its history in the plan (pp. 404–13); (6) the Summer Learning Program is now the Summer Remediation Program (p. 414–15); (7) the past tense used in the initial paragraph explaining the LRSD/JTPA literacy program mysteriously has slipped into the future (p. 415); (8) a funding qualifier has been added for continuation of the LRSD/JTPA literacy program (p. 415).

### 3. NLRSD Proposed Revisions

With the explanation provided by the parties concerning the NLRSD Revised Desegregation Plan dated December 1, 1989, the Court is happy to reconsider the position taken in the June 21 order. The Court finds that the December 1989 plan was not a part of the NLRSD's settlement plans approved by the court of appeals, and therefore the NLRSD is not bound by the additional commitments therein. The Court commends the NLRSD to the extent that it has implemented such provisions, as represented in the parties' brief. *See* Brief at 15 n. 1. The question still remains, however, why this document was submitted to the court of appeals.

At first glance, the proposed revisions in the NLRSD plan appear mostly transitional. However, the history of the voluntary transfer commitment between the NLRSD and PCSSD has been deleted (p. 914). Such historical information provides a context for the present and a guide for the future. In addition, the language inserted in its place constitutes a new agreement among the parties regarding voluntary transfers.

The change providing for the appointment by the Joshua intervenors of someone to serve on the NLRSD's intradistrict review committee to monitor special education cannot fairly be deemed transitional. If the December 1989 plan is not a part of the court-approved settlement plans, the parties are correct in pointing out that they did not delete settlement language delineating requirements for members of this committee.

Although NLRSD's May submission does not contain voluminous revisions as found in the plans submitted by the LRSD and PCSSD, it does not comply with the Court's instructions to submit the modified plans in a single document signed by all parties. At the anticipated hearing on the proposed revisions, the NLRSD must be able to demonstrate that any changes lie within the acceptable categories of change delineated by the court of appeals, and that such changes are reasonable and necessary.

### V.

With the one exception noted in section IV, nothing set forth in this order in any way alters or supersedes the Court's order of June 21, 1991. Accordingly, the parties' motion to reconsider is denied, except as noted.

IT IS SO ORDERED.

EXHIBIT A

## VIII. DESEGREGATION PLAN AMENDMENT PROCESS

Any desegregation plan should contain sufficient flexibility to deal with changing conditions and meet unforeseen developments. Therefore, in addition to reasonable monitoring and review processes, the plan must include a mechanism for the presentation and review of amendments.

1. The Office of Desegregation ("the Office") shall be the initial clearing house for all proposed amendments. Proposed amendments may arise in multiple ways, including:

A. As a function of the monitoring process;

B. As a result of success or failure in the desegregation process or in specific programs;

C. From recommendations of teachers or staff;

D. From patron and student suggestions;

E. As a result of the development of new approaches elsewhere in the nation;

F. In response to legislative changes in formula or program funding;

G. Through other changes in the law;

H. Through changing demographics;

I. By agreement or consultation among neighboring districts and/or with other parties.

2. Proposed changes or refinements should first be submitted to the Office for initial review and analysis. The Office will involve appropriate staff, and/or others, for initial evaluation of the proposal.

3. The Office will make initial or preliminary recommendations regarding the proposal to the Superintendent and Board for comment and advice. Such recommendations may include a recommendation for further study. Where appropriate, surveys and public meetings may be used to generate patron and student comment on the proposal. Informal contact and consultation with relevant litigative parties should also be had when and to the extent appropriate from this point forward in the process.

4. After such further comment and study as may be necessary, the Office will complete analysis of the proposal and make a final recommendation to the Superintendent.

5. The Superintendent will in turn make the final recommendation to the Board.

6. If the Board approves, the matter will be submitted to the Court, and formally submitted to other litigative parties.

7. If the Court approves, the plan shall be amended to set forth the change, noting the effective date.

The process outlined above should itself be flexible, however. While the sequence described should be followed generally, some steps may be taken in parallel in some instances, and in other instances a need for expedition may truncate some steps or the routine content of a proposal may make some steps *pro forma.*

—from the Pulaski County Special School District Permanent Intra–District Desegregation Plan (9 App. 2049–50)

EXHIBIT B

## FRIDAY, ELDREDGE & CLARK

A PARTNERSHIP OF INDIVIDUALS AND PROFESSIONAL ASSOCIATIONS

ATTORNEYS AT LAW

2000 FIRST COMMERCIAL BUILDING

400 WEST CAPITOL

LITTLE ROCK, ARKANSAS 72201-3493

TELEPHONE 501-376-2011

FAX No. 501-376-2147

HERSCHEL H. FRIDAY, P.A.
B. S. CLARK
ROBERT V. LIGHT, P.A.
WILLIAM H. SUTTON, P.A.
JAMES W. MOORE
BYRON M. EISEMAN, JR., P.A.
JOE D. BELL, P.A.
MICHAEL G. THOMPSON, P.A.
JOHN C. ECHOLS, P.A.
JAMES A. BUTTRY, P.A.
FREDERICK S. URSERY, P.A.
H. T. LARZELERE, P.A.
OSCAR E. DAVIS, JR.
JAMES C. CLARK, JR., P.A.
THOMAS P. LEGGETT, P.A.
JOHN DEWEY WATSON, P.A.
PAUL B. BENHAM III, P.A.
LARRY W. BURKS, P.A.
A. WYCKLIFF NISBET, JR., P.A.
JAMES EDWARD HARRIS, P.A.
J. PHILLIP MALCOM, P.A.
JAMES M. SIMPSON, P.A.
MEREDITH P. CATLETT, P.A.
JAMES M. SAXTON, P.A.
J. SHEPHERD RUSSELL III
DONALD H. BACON, P.A.
WILLIAM THOMAS BAXTER, P.A.
WALTER A. PAULSON II, P.A.
BARRY E. COPLIN, P.A.
RICHARD D. TAYLOR, P.A.
JOSEPH B. HURST, JR., P.A.
ELIZABETH J. ROBBEN, P.A.
CHRISTOPHER HELLER, P.A.

LAURA HENSLEY SMITH, P
ROBERT S. SHAFER, P.A.
WILLIAM M. GRIFFIN III, P.
THOMAS N. ROSE, P.A.
MICHAEL S. MOORE
DIANE S. MACKEY, P.A.
WALTER M. EBEL III, P.A.
KEVIN A. CRASS
WILLIAM A. WADDELL, JR.,
CLYDE "TAB" TURNER
CALVIN J. HALL, P.A.
SCOTT J. LANCASTER
JERRY L. MALONE, P.A.
M. GAYLE CORLEY, P.A.
ROBERT S. BEACH, JR., P
S. RANDOLPH LOONEY
J. LEE BROWN
JAMES C. BAKER, JR.
H. CHARLES GSCHWEND, J
HARRY A. LIGHT
SCOTT H. TUCKER
JOHN CLAYTON RANDOLPH
GUY ALTON WADE
PRICE C. GARDNER
THOMAS F. MEEKS
J. MICHAEL PICKENS
TONIA P. JONES
DAVID D. WILSON
JEFFREY H. MOORE

COUNSEL

WILLIAM J. SMITH
WILLIAM A. ELDREDGE, JR.
WILLIAM L. TERRY
WILLIAM L. PATTON, JR., P

WRITER'S DIRECT NO.

May 30, 1991

RECEIVED

JUN 3 1991

Office of Desegregation Monitoring

Mr. Sam Jones
WRIGHT, LINDSEY & JENNINGS
2200 Worthen Bank Bldg.
200 West Capitol
Little Rock, AR 72201

Mr. Steve Jones
JACK, LYON & JONES, P.A.
3400 Capitol Towers
Capitol & Broadway
Little Rock, AR 72201

370-1506

Mr. John Walker
JOHN WALKER, P.A.
1723 Broadway
Little Rock, AR 72206

Mr. Richard Roachell
MITCHELL & ROACHELL, P.A.
1014 West Third
Little Rock, AR 72201

Re: Interdistrict School

Dear Counsel:

In accordance with our agreement that the Westside Junior High School site will be the location of a new interdistrict elementary school, the Little Rock School District intends to begin asbestos removal and demolition of the old Westside Junior High School. LRSD will also hire an architect to begin planning the new school so that we can be sure the school will open on the date set forth in our proposed desegregation plan. Please let me know if you have any questions or concerns about these actions.

Yours very truly,

Christopher Heller

CJH/k

cc: Ann Brown
    Chip Jones