**UNITED STATES of America**

v.

**STATE OF LOUISIANA.**

Civ. A. No. 80–3300.

United States District Court,
E.D. Louisiana.

Dec. 23, 1992.

Order and Reasons
Denying Reconsideration
Jan. 20, 1993.

---

Franz Marshall, Civ. Rights Div., U.S. Dept. of Justice, Washington, DC, for plaintiff.

Thomas Halligan, Asst. Atty. Gen., Louisiana Dept. of Justice, Baton Rouge, LA, for defendant.

## OPINION AND ORDER

CHARLES SCHWARTZ, Jr., District Judge.

Considering the decision of the United States Supreme Court in *United States v. Fordice*[1] vacating the Court of Appeals decision in *Ayers v. Allain*,[2] this Court ordered the parties to appear and show cause on September 30, 1992 why the Court should not reinstate its now vacated order granting summary judgment in favor of the United States and enter the Court's proposed remedial order with respect thereto.[3] On September 25, 1992 the Court continued and reset the hearing for Monday, November 2, 1992, pursuant to a "Joint Motion to Continue Rule to Show Cause."[4] After the November hearing and at the behest of the parties, the Court granted the parties additional time to file reply briefs.[5] By minute entry order dated December 11, 1992, this Court reset the time for filing reply memoranda to Friday, December 18, 1992, and a final show cause hearing was rescheduled for and heard on December 22, 1992, at 10:00 a.m. For the reasons stated herein, the Court REINSTATES its August 12, 1988 Order granting summary judg-

---

**1.** —— U.S. ——, ——, 112 S.Ct. 2727, 2743, 120 L.Ed.2d 575 (1992).

**2.** 914 F.2d 676 (5th Cir.1990) (*en banc*).

**3.** *See United States v. Louisiana*, 692 F.Supp. 642 (E.D.La.1988), *vacated in* 751 F.Supp. 621, 624 (E.D.La.1990); *see also United States v. Louisiana*, 751 F.Supp. 606, 608 (E.D.La.1990) (setting forth the Court's proposed remedial order in the form of Revised Exhibit "A").

**4.** The stated purpose of the requested continuance, signed by the Attorney General of the Louisiana Department of Justice, Richard P. Ieyoub, and Franz Marshall of the U.S. Department of Justice, among others, was to engage in settlement negotiations. The parties related to the Court in a status conference preceding the initial show cause hearing that they anticipated reaching some agreement on an alternative remedial measure both palatable to the parties and comporting with the dictates of *Fordice*. Notwithstanding the fact that over a decade had intervened since the institution of these proceedings during which time the parties had apparently failed to reach an amicable solution, the Court placed its skepticism aside and allowed the parties a final opportunity to accomplish their stated purpose.

**5.** *See* Minute Entry, R.Doc. No. 593, at ¶ 4 (E.D.La. Nov. 2, 1992).

ment in favor of the United States and hereby sets forth the final remedial order of the Court with respect to the system of higher education in the state of Louisiana.

## I. PERTINENT PROCEDURAL BACK-GROUND

In response to the Court's initial show cause order, certain parties, including the United States and the "state defendants"[6] submitted written objections. A thorough reading of the parties' objections indicates that they overlooked a substantial and significant segment of these proceedings as well as the Court's concomitant findings relative to the issue of liability. This period beginning mid-year 1988 encompasses the most active, productive, and recent years in the long history of this litigation. Prior to addressing the particulars of the parties' submissions and arguments, a brief outline of the litigation during this "forgotten" period is therefore essential.

On August 2, 1988, this Court issued an order granting the United States' motion for summary judgment on the issue of liability with regard to the state of Louisiana's operation of a dual college system based on race.[7] Therein the Court determined that the consent decree, under which the parties had operated from September 1981 until December 1987, had failed to eradicate the de facto segregation present in Louisiana's higher education system.[8]

The Court thus informed the parties that a "drastic change" may be required and suggested possible remedies including: (1) reducing the number of senior colleges and many of their duplicative programs; (2) instituting a system of junior colleges with open admissions; (3) instituting higher entrance requirements to the remaining senior colleges; and (4) reverting state supervision over the institutions to a single board.[9] Numerous hearings and court conferences, including extensive proceedings before a Special Master, were subsequently held on the issue of remedy.[10] The proceedings before the Special Master culminated in the issuance of the Special Master's Final Report.[11]

On July 19, 1989, this Court issued its Opinion and Order which expounded on its prior August 2, 1988 order, to wit:

As the Court's August 2, 1988, opinion discusses, four state universities—SUBR, SUNO, SUSBO and Grambling—were originally established as institutions for blacks only. The remaining four-year state universities were established for whites only. It was not until sometime after the enactment of the Civil Rights Act of 1964 that the State of Louisiana discontinued official recognition of state universities as single race institutions. However, with respect to most schools, de facto racial identifiability has continued to the present.[12]

---

**6.** See *infra* text accompanying note 22.

**7.** *United States v. Louisiana,* 692 F.Supp. 642 (E.D.La.1988).

**8.** The *overall result* during the "reign" of the consent decree was *more* rather than less *racial segregation,* which the Court noted in its August 2, 1988 order, to wit:

Despite the slight increase in black enrollment state-wide, the racial polarization base increased as a whole during the term of the consent decree: the predominantly white institutions had about 2000 fewer black students in 1987 than in 1981, while the predominantly black institutions showed only a negligible increase in white enrollment from around 0.3% in 1981 to around 1.1% in 1987. In 1981, around 55% of the black students enrolled at institutions of public higher education in the state were enrolled at predominantly white institutions, while in 1987 the

corresponding figure fell significantly to about 47%.
*Id.* at 645.

**9.** *Id.* at 658; *see also infra* note 15 and accompanying text.

**10.** By Order of Reference dated December 2, 1988, a Special Master was appointed and invested with authority under F.R.C.P. Rule 53 to review proposed remedial plans submitted by the parties and "to conduct hearings regarding the viability of the proposed plans, and any other appropriate remedial measures." A detailed reporting of the proceedings before the special master is contained in the Special Master's Final Report, R.Doc. No. 460, at pp. 4–8.

**11.** R.Doc. No. 460.

**12.** *United States v. Louisiana,* 718 F.Supp. 499, 503 (E.D.La.1989) (citations omitted).

The Court also concluded that (1) "the racial identifiability of Louisiana's state universities is especially evident in the coexistence of predominantly black institutions (PBIs) and predominantly white institutions (PWIs) in close geographic proximity in four areas of the state"; [13] (2) "the governing boards of these institutions are also racially identifiable"; [14] (3) "the present scheme for governing education in Louisiana—three operating boards and one coordinating board—has perpetuated illegal segregation in Louisiana" and "almost guarantees a standoff between the two 'systems' (LSU and Southern) and the rest of higher education"; [15] and (4) "the evidence demonstrates there is more program duplication in Louisiana than is desirable from the point of view of educational efficiency" and such duplication of programs especially involving proximate institutions "can have a stultifying effect on desegregation." [16] Thereafter, the Court released a proposed remedial order to the parties for comment.

On October 30, 1990, the Court issued two orders in connection with this matter. The first order responded to written objections to its proposed remedial order. This Court held that the proposed remedial order would be revised to amend overly ambitious deadlines and explained:

> The Court rejects all other objections to the Proposed New Plan and would enter a final Order herein in the form annexed hereto as Revised Exh. A. Thus, if the Judgment to be entered hereinafter with respect to the motion for summary judgment and dismissal of this action is reversed on appeal, the remedial order set forth in Revised Exh. A shall be considered the Order of this Court without the necessity of any further hearing. [17]

The Court by separate order also found what was then the recent Fifth Circuit decision in *Ayers* to be both binding and controlling. It therefore (1) vacated its Order of August 2, 1988; (2) denied summary judgment in favor of the United States; and (3) granted summary judgment in favor of the defendants. [18] The Court succinctly stated its purpose in setting forth its "would be" remedial order. The Court wrote:

> Had this Court a clean, or at least a pre-*Ayers* (en banc), slate, the Court would not vacate its Order herein of August 2, 1988 and would enter a remedial order in the form of "Revised Exh. A" attached to the Order and Reasons [R.Doc. No. 567] issued this date. *Thus, if the judgment entered herewith is reversed on appeal, that proposed remedial order should be considered the Order of this Court without the necessity of a remand.* [19]

After *Ayers* was overruled by the Supreme Court, [20] the Fifth Circuit Court of Appeals vacated this Court's October 30, 1990 decision, which had in turn, vacated this Court's prior order granting summary judgment in favor of the United States. The Court of Appeals then remanded the case to this Court "for further consideration in light of the United States Supreme Court's decision in *United States v. Fordice*" and *not* necessarily for further evidentiary hearings and findings. [21]

The following parties have submitted written responses to the Court's rule to show cause order: the United States of America; the attorney general of the state of Louisiana, Richard P. Ieyoub, W. Shelby McKenzie, Margaret E. Woodward, Robert A. Kutcher, and Trevor Bryan [hereinafter

---

13. *Id.* at 504.

14. *Id.*

15. *Id.* at 505.

16. *Id.* at 513.

17. 751 F.Supp. at 624.

18. *United States v. Louisiana,* 751 F.Supp. 606, 608 (E.D.La.1990).

19. *Id.* (emphasis added).

20. —— U.S. at ——, 112 S.Ct. at 2743.

21. R.Doc. No. 580.

the "state defendants"] [22]; and the Bossier Parish School Board and Community College [23] appearing through District Attorney of the twenty-sixth Judicial District for the Parish of Bossier–Webster Louisiana, James M. Bullers.

## II. DISCUSSION

Throughout this litigation, the only real issue and bone of contention between the parties was and remains to this day, remedy. All concerned considered the issue of liability secondary—almost a foregone conclusion given the historic treatment of blacks in the state of Louisiana and the well-known racial imbalances among its state universities. Until recently, even the state defendants had not seriously disputed the fact that the current structure of the higher education system in Louisiana continues to perpetuate the segregation which the state's laws once mandated.[24]

The lack of dispute with regard to the issue of liability recently lead the parties to reinvigorate their efforts to negotiate a remedial plan which would comport with *Fordice*.[25] However, despite being given an ample period of time within which to resolve their differences and after continu-

ing to represent to the Court that it was very possible that a compromise could be reached, the state defendants have failed to submit to the Court for consideration a remedial plan to which they could all agree. This is not by any means the first time this Court has been forced to confront reticence among the parties. When the Court last spoke on the issue of remedy, for example, it noted that former Attorney General William J. Guste, Jr.'s unresponsive reply to the Court's proposed remedial plan was "designed to delay any ultimate resolution of this case." [26]

### A. SPECIFIC OBJECTIONS

The first objection comes from the United States. In that objection, the United States relates that it "believes that the Court's previous determination that twenty institutions under the four higher education boards are continuing to be operated under an unlawful, dual system of education in violation of Title VI" was correct.[27] The United States, however, contends that the Court's 1988 order is inconsistent with *Fordice* because it lacked "specific findings in all areas." [28] The United States has thus urged this Court to make

---

**22.** The Court reminds the parties that it has previously held that "the Governor, as the head of the executive branch, is the primary representative of the State herein, and, as such," shall dictate the State's course in this litigation. *United States v. Louisiana,* 751 F.Supp. 608, 617 (E.D.La.1990). The parties recently reaffirmed their commitment to the Governor when they each agreed to be represented by the Attorney General, the Governor's current representative in this litigation. *See* Minute Entry, R.Doc. No. 593 (E.D.La. Nov. 2, 1992). Thus, to the extent that certain-named state defendants have filed in the record their proposed remedy and/or positions which are not endorsed by the Attorney General, procedurally they must be construed as negotiations between the respective entities relative to a proposed compromise. Although the Court has permitted their filing in order to complete the record, it would be inappropriate for the Court to consider such in reaching a decision herein.

**23.** Bossier Parish School Board's does not object to the reinstatement of the Court's August 2, 1988 order. It, however, expresses concern regarding the reach of Paragraph 17 of "Revised Exhibit A" insofar as it could affect Bossier Parish Community College. Inasmuch as the Court's August 2, 1988 Order granted summary

judgment in favor of Bossier Parish School Board finding that Bossier Parish Community College was not operating in violation of Title VI of the 1964 Civil Rights Act, it requests that the Court amend "Revised Exhibit A" to expressly clarify that Bossier Parish Community College will not be affected by the imposition of that remedial decree. The Court agrees and has therefore made the appropriate revisions in its final remedial order which follows this Opinion.

**24.** In their December 18, 1992 filings, various parties submitted legal memoranda arguing that the university system, as it now stands, does not violate the Constitution. As will be seen, their arguments border on the absurd when considered against the Court's findings throughout the course of the litigation.

**25.** *See supra* note 4.

**26.** 751 F.Supp. at 623.

**27.** *See* United States' Response to the Court's September 10, 1992 Order, R.Doc. No. 587, at pp. 1–2.

**28.** *Id.*

additional findings of fact based on the record as it now stands.[29]

The state defendants, on the other hand, argue that the current record is stale and that the Court has yet to "make the discrete and particularized factual inquiries required under *Fordice*."[30] Among other things, the state defendants allege that the Court has not made findings relative to the questions of: (1) whether admissions standards and institutional mission assignments within the Louisiana higher education system perpetuate the prior *de jure* segregation and (2) whether it would be practicable and consistent with sound educational policy to eliminate any discriminatory effects created by the admissions standards and institutional mission assignments. The state defendants further complain that the factual record, as it now stands, is insufficient to support a determination with regard to what they consider to be the absent findings of fact because a trial has not been held.

## B. THE REQUIREMENTS OF *FORDICE*

In *Fordice*, the United States Supreme Court ruled that the district court had failed to support its conclusion that state action was not a contributing factor to the racial identifiability prevalent in Mississippi's higher education system.[31] In so doing, the Court specifically held that the adoption and implementation of race neutral policies by a state is insufficient to discharge its duty to dismantle a dual higher education system where the state has officially endorsed a segregated dual system in the past. Rather, the state remains liable under the Fourteenth Amendment until it is shown that the racial identifiability of a school, whether primary, secondary, undergraduate, or graduate, is not attributable to the state's prior *de jure* segregative policies.[32] "If policies traceable to the *de jure* system are still in force those policies too must be reformed to the extent practicable and consistent with sound educational practices."[33] The conclusion is the same regardless of the state's intent.[34]

■ Under the *Fordice* standard, the record must therefore support two independent findings before liability can be imposed. First, the factual record must demonstrate that state action attributable to prior *de jure* segregative policies continues to restrict freedom of choice. In commenting on the freedom of choice available to minorities in Mississippi's system of higher education, the Supreme Court considered admissions standards, program duplication, institutional mission assignments, and the necessity of continuing to operate all of Mississippi's public undergraduate and graduate schools.[35] Secondly, the factual record must also support the conclusion that the state failed to justify its policies with sound educational principles. In its attempt to justify policies with a segregative effect, the state is saddled with a heavy burden and, if the state "can accomplish its educational objectives through less segregative means," the policies will not be upheld.[36]

## C. THE CONTINUING VIABILITY OF THE RECORD

■ As stated previously, the state defendants have expressed concerns about

29. The United States also suggested that the Court's findings of fact could be expanded by allowing the parties to develop proposed findings of fact based on the current record or after limited discovery. As further discussed, *infra*, the Court finds that the current record is sufficient to support the determination herein and further delay would be superfluous.

30. *See* State Defendants' Opposition Memoranda to Reinstatement of the Court's Summary Judgment Order of August 2, 1988 and Remedial Order of October 30, 1990, R.Doc. No. 588, at p. 3.

31. —— U.S. at ——, 112 S.Ct. at 2737; *cf. Abbott Laboratories v. Mead Johnson & Co.,* 971 F.2d 6, 21 (7th Cir.1992).

32. —— U.S. at ——, 112 S.Ct. at 2736.

33. *Id.*

34. *Id.* at ——, 112 S.Ct. at 2738 n. 8.

35. *Id.* at ——, 112 S.Ct. at 2738. The Court was, however, careful to note that its inquiry was neither exclusive nor exhaustive. *Id.*

36. *Id.* at ——, 112 S.Ct. at 2743–44 (O'Connor, J., concurring).

the viability of the record in light of the two years that have passed since this Court made its last factual findings. Yet they have identified little and certainly nothing that this Court considers significant to suggest that intervening events have caused the higher education system in Louisiana to undergo a dramatic reformation which would lead it into compliance with the Constitution.[37] For example, in support of their position, the state defendants produced the affidavits of Chancellor Winston R. Day of the LSU Law Center[38] and Chancellor B.K. Agnihotri of the Southern Law Center.[39] In addition to recognizing the improvements in Southern Law Center's facilities and curriculum, the Court applauds LSU Law Center's most recent affirmative action efforts which led to a 3.6% increase in black student enrollment between 1988 and 1991.[40] However, LSU Law Center's minority student enrollment for the past academic school year (i.e., 5%) still pales by comparison to the 1988–89 enrollment for Tulane Law School (i.e., 18% minority students),[41] a private institution, located in New Orleans, Louisiana, with a student population of 855 students and highly selective admissions standards. There is no question in the Court's mind that Louisiana's dual system perpetuated by duplicative programs, multiple boards, coexistence of PBIs and PWIs with similar programs existing in close proximity to each other, *inter alia,* has *not* spontaneously disappeared.[42]

Moreover, the Court notes that the affidavits are the state defendants' *only evidence* of change within a former PBI or that black students are being admitted in greater numbers to a "formerly" all white school, and to that end, the evidence is limited to two departments within two different institutions. Considering that the Court revisits this case after only two years and in the absence of even a preliminary showing by the parties that the Court's extensive findings are now dated, the Court refuses to entertain the possibility of further delay in the implementation of its remedial plan.[43]

## D. SUFFICIENCY OF THE RECORD

The Court summarily rejects the state defendants' argument that the factual record, as it now stands, fails to support a

37. Contrary to the suggestion of the state defendants, the record reflects that all parties have been given ample opportunity to rebut the Court's findings with evidence demonstrating the educational soundness and practicality of the current state of affairs. This Court, however, was and still is of the opinion that the evidence of discrimination was so overwhelming that the state of Louisiana's failure to produce evidence to the contrary came as no surprise.

38. R.Doc. No. 592.

39. R.Doc. No. 606.

40. In 1988, black students comprised only 1.4% of the student population at LSU Law Center. While in 1991–92, African–American enrollment had risen to 5%. *See* Affidavit of Chancellor William R. Day, R.Doc. No. 592. These figures diverge somewhat from prior statistics accepted by this Court because officially compiled statistics in Louisiana have only recently begun to distinguish between blacks and other minorities. *See* 718 F.Supp. at 513.

41. 718 F.Supp. at 525.

42. Although the state's submission is insufficient to justify a continued inquiry into the issue of liability, it has lead the Court to revisit its conclusions with regard to the appropriate remedy relative to the state's law schools. *See infra* note 54.

43. *See Bowman Transp. v. Arkansas Best Freight System,* 419 U.S. 281, 294, 95 S.Ct. 438, 446, 42 L.Ed.2d 447 (1974) (refusing to remand case where there was a five year lapse between evidentiary hearings and administrative decision despite changed circumstances). The Supreme Court has rarely remanded cases for further evidentiary hearings and has done so only under exceptional circumstances. In *Veterans of the Abraham Lincoln Brigade v. Subversive Activities Control Bd.,* 380 U.S. 513, 514, 85 S.Ct. 1153, 1153, 14 L.Ed.2d 46 (1965), for example, the case was remanded to the district court when the evidentiary hearings were conducted ten years prior and had considered events that had taken place in Spain during the 1930s. In other words, the facts which were the subject of the evidentiary hearing took place thirty years before the case was presented to the Court. It is also relevant to note that three justices found that even a thirty year gap did not prevent the matter from being ripe for decision. *Id.* at 514, 85 S.Ct. at 1153 (Douglas, Black, Harlan, JJ., dissenting) (finding that the factual record was not stale).

decision as to the issue of liability. What the state defendants have failed to realize is that in the context of school desegregation a line cannot be drawn between the issues of liability and remedy. The two concepts are inextricably interwoven and thus the evidence marshalled by the parties relating to the issue of liability was necessarily re-presented, expanded upon, and reconsidered by the Court and the Special Master during the extensive proceedings which focused on remedy. Thus, the Court's considered decision with respect to remedy necessarily involved an inquiry into such matters as the educational soundness of current state policies and the practicability of dispensing with them; the very same issues considered in *Fordice.*

The Court, for example, would remind the parties of the following findings that consider the discriminatory impact and unjustifiable inefficiencies created by Louisiana's current organizational structure in higher education:

> The evidence suggests Louisiana's multi-board arrangement has led to unnecessary and costly program duplication.[44] The import of *this finding* is that the single board solution posits a relationship between efficiency and desegregation, particularly to the extent program duplication results from the multiboard structure in Louisiana. It is critical to the success of integrating the historically black institutions that they be upgraded and given desirable programs in order to attract a significant number of white students. Only by creating an

organizational structure with the power to make program decisions statewide can these efforts be achieved. *Inefficiencies also suggest the dissipation of scarce resources for higher education which, given the difficult fiscal times Louisiana is facing, can only further impair the states ability to enhance its historically black institutions.*[45] Thus, program duplication is highly relevant to desegregation.[46]

The Court would also direct the parties' attention to the following findings relative to the current admissions policies of Louisiana state institutions, to wit:

> *The current practice of open admissions to all four year institutions is counter-productive, both in terms of educational objectives and racial integration.* The objective is not simply to admit students into college, but to educate and graduate them. In terms of undergraduate degree productivity, the Louisiana open admissions system is a failure.... [O]nly 33.2 percent of the students who entered higher education in Louisiana in 1982 had received bachelors and associates degrees after six years of attendance; far below the national average of 44.9 percent for public universities.

Thus, with an open admissions system, students enter higher education (both four and two years) easily, but do not readily leave with degrees. Moreover the problem is particularly acute at institutions with a large black population, notably SUNO.[47]

---

**44.** *See* Special Master's Final Report, R.Doc. No. 460, at p. 49 (citing Witness Statement of Roy McTarnaghan, Vice President for Academic Affairs for the University of Florida System, at pp. 17–18 (charting program duplication in Louisiana in contrast to Florida)).

**45.** *See Id.* at pp. 51–52.

**46.** 718 F.Supp. at 508 (emphasis added).

**47.** *Id.* at 510 (footnotes omitted); *see also id.* at n. 19 (pointing to the hidden cost of program inefficiencies where all of higher education must devote resources to remedial programs in cases of open admissions standards which fail to organize students by academic ability). Unlike the Mississippi higher education system as

discussed in *Fordice,* Louisiana does not formally classify or organize its public institutions based on mission. *See* Special Master's Report, R.Doc. 406, at p. 63. Rather, as discussed ad infinitum by the Court and the Special Master, the state institutions of higher education are organized under four separate governing boards with little regard for logic or efficiency. The role that these boards have played in sustaining a segregated higher education system and the educational benefits of eliminating these boards in favor of the mission assignment framework reflected in the Court's remedial order has been thoroughly discussed in prior opinions. *See* 718 F.Supp. at 503–13.

The graying of the line between remedy and liability was especially prevalent in this case due to the nature of the prior proceedings. As already noted, those proceedings included numerous hearings and conferences before the Court and Special Master in which the current organizational structure of Louisiana's higher education system was thoroughly investigated and compared with alternative systems. The parties were given an opportunity to comment at every stage of the proceedings. And given the state defendants' relentless struggle to maintain the status quo, the Court rests well assured that they presented the Court with their most convincing arguments and evidence pertinent to the educational soundness of the current system of higher education.

■ In sum, when the record in this case is viewed as a whole, the analytic framework and requisite factual inquiries now required as articulated in *Fordice* were made by this Court long before it had the benefit of the Supreme Court's guidance.[48] Consequently, the Court, based on the entire record and including the most recent submissions, adopts by reference its findings of fact as set forth in its prior opinions and orders and reasons and concludes as follows: (1) The state of Louisiana continues to act through its policies and practices in a manner that promotes segregation within its higher education system[49]; (2) those policies and practices are traceable to the Louisiana's long history and endorsement of segregation[50]; and (3) Louisiana's policies and practices are without sound educational justification and can be practicably eliminated.[51]

### E. CONCLUSION

It would appear from their continued posturing and less than convincing arguments that the state defendants have forgotten the mandates of the Constitution as interpreted by the Supreme Court. Instead, they would have this Court move to the beat of a different drummer by disparaging the significant factual findings which issued as a result of the proceedings following August 2, 1988. For the Court to have followed the state defendants suggested course would have resulted in vain and unnecessary re-litigation of this entire matter at great expense to the taxpayers of Louisiana and the United States. More importantly, the Court could not overlook the touchstone of the judiciary's responsibility to ensure equality in educational opportunity—to "end segregated public education with all deliberate speed."[52] Simply put, the dubious ideal of "separate but equal," whether endorsed by whites or blacks, is an anachronism that our society no longer tolerates.[53]

The Court's final remedial plan, which follows this Opinion, is a considered effort to reconcile innumerable interests and provide specification of enforceable guidelines for ending desegregation in Louisiana's higher education system while at the same time permitting flexibility in its day to day management. With the cooperation of the parties and the assistance of the Monitoring Committee, an ongoing effort can be made to adjust the Court's basic remedial plan to account for future developments and changes in the higher education system of Louisiana.

**48.** *See Knight v. Alabama,* 801 F.Supp. 577, 580–81 (N.D.Ala.1992) (rejecting argument that the record was insufficient to support its pre-*Fordice* remedial order).

**49.** *See, e.g.,* 718 F.Supp. at 505 ("A truism thus emerges: The present scheme for governing education in Louisiana—three operating boards and one coordinating board—has *perpetuated illegal segregation* in Louisiana's higher education, even though the system's creation postdates the filing of this case."); 718 F.Supp. at 523.

**50.** *See, e.g., Id.* at 503–04; 692 F.Supp. at 645–47.

**51.** *See, e.g.,* 718 F.Supp. at 507–11; 718 F.Supp. at 529–32. See also the previously quoted statements of the Court, *supra* notes 44–47 and accompanying text.

**52.** —— U.S. at ——, 112 S.Ct. at 2732 (quoting *Brown v. Board of Educ. (Brown II),* 349 U.S. 294, 301, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955)).

**53.** *Id.* (citing *Brown v. Board of Educ. (Brown I),* 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873 (1954)).

For all of the above and foregoing reasons, the Court declines to alter its remedial plan except in certain particulars referred to above and to the extent that the Court's prior plan (i.e., Revised Exhibit "A") called for the merger of LSU Law Center and Southern Law Center.[54] Accordingly, the Court enters the following orders:

IT IS ORDERED that the August 2, 1988 Order of this Court granting summary judgment in favor of the United States is hereby REINSTATED.

IT IS FURTHER ORDERED pursuant to the Special Master's Final Report, with the findings and modifications noted above including the findings set forth in prior opinions, orders and reasons, and opinions adopted *nunc pro tunc*[55] by this Court, that the following "Remedial Order" is hereby entered as the final remedial order of this Court, to wit:

IT IS HEREBY ORDERED that:

### Single Governing Board

1. Within sixty days of the Implementing Date,[56] the four boards currently governing public higher education in Louisiana shall be disbanded and their powers consolidated into a single state governing board. The new board ("board") shall be given ultimate authority over academic, budgetary, personnel, and administrative affairs of each of the public institutions currently overseen by the Board of Trustees, the Southern Supervisors, and the LSU Supervisors. Additionally, the board shall be given the special mission of monitoring and implementing the remedial Order of the Court and of insuring the progress toward eliminating Louisiana's racially dual education system is achieved. The board shall determine an appropriate name for the new coordinated system of higher education, such as the "University of Louisiana System."[57]

2. The board shall have seventeen voting members and one student member. The board shall elect a chair from among its members on an annual basis. The voting members shall be appointed by the Governor and confirmed by the Louisiana Senate.

Board members shall have staggered terms of five years to run from date of appointment and reappointment for one ad-

---

54. Since the Court's original opinion regarding *remedy*, the state has introduced evidence concerning recent developments at the LSU and Southern law centers, which leads the Court to conclude that the "drastic" remedy of merger, as prescribed in the Court's original remedial plan, would now be inappropriate.

In recent years, the state has made ample efforts to improve the quality of education at Southern Law Center and has also laid some of the foundations necessary to the successful integration of the LSU Law Center. As to Southern Law Center, the evidence submitted to the Court demonstrated that: (1) the school is fully integrated with a current student racial composition of 53% blacks and 47% whites; (2) the student/faculty ratio, 17:1, is within acceptable limits; (3) there has been a marked improvement in the bar passage rate among Southern law students; (4) the library facilities are in compliance with ABA standards; and (5) the physical facilities are undergoing extensive renovation. *See* Affidavit of Chancellor B.K. Agnihotri, R.Doc. No. 606. As to LSU Law Center, the evidence submitted demonstrated that: (1) there was a 3.6% increase in black student enrollment between 1988 and 1991; (2) financial grants and tuition waivers for black students have increased substantially; and (3) recruitment efforts of black students both within and outside the state have been expanded. *See* Affidavit of Chancellor Winston R. Day, R.Doc. No. 592. As stated previously, the Court commends the state and the administrators at the respective schools with regard to these improvements. Additional remedial steps, as specified in the remedial plan at ¶ 26, are, however, warranted to ensure a continued and sustained effort on the part of the state.

55. *United States v. Louisiana*, 718 F.Supp. 499 (E.D.La.1989) *and* 718 F.Supp. 525 (E.D.La. 1989).

56. Except as provided in the following sentence, the term "Implementing Date" shall mean thirty-five calendar days following the date of entry of this Order. If one or more appeals are filed and a stay of this Order pending appeal is granted by this Court, the Fifth Circuit, or the Supreme Court, then the term shall mean the date of issuance of mandate of the final appellate judgment.

57. The names and titles used in this Order are only suggestions; the board is free to craft different names or titles so long as they are otherwise consistent with the remedial goals of this plan.

ditional term shall be permitted. The initial terms shall be for three, four, or five years in order to permit the staggered system to begin. These terms shall apply to six, six, and five members, respectively.

The board members appointed pursuant to this Order shall include three persons chosen from the present Board of Regents, with one person to hold a three year appointment, one a four year appointment and one a five year appointment; two persons chosen from the present LSU Board of Supervisors, with one person to hold a four year appointment and one person to hold a five year appointment; two persons chosen from the present Southern Board of Supervisors, with one person to hold a four year appointment and one person to hold a five year appointment; and two persons chosen from the present Board of Trustees, with one person to hold a four year appointment and one person to hold a five year appointment.[58]

In making appointments to the board, the Governor shall not only select persons with established skills and experience in higher education, but shall also select persons firmly committed to the desegregation goals of the Court's Order and the Court's methods for implementing the Order. Additionally, board members shall be selected to broadly represent the racial, ethnic, gender, and geographic diversity of the state.

3. For the first five years after the Implementing Date, the Court shall reserve the right to veto the composition of the board, if the board's composition does not adequately take into consideration the goals of this Order or does not work to ensure participation by Louisiana's black citizens. In addition, the board shall appoint one student member on an annual basis, pursuant to a procedure established by the board. A black student frequently should be appointed.

4. The board shall be charged with appointing a full-time president. This person shall have an established and extensive background in higher education gover-

nance, and a sensitivity to the educational needs of racial minorities. The president shall serve at the pleasure of the board and be delegated operational authority over the university system.

5. There shall be a substantial administrative staff to support the new president, which will utilize the personnel and resources of the Board of Regents and the three operating boards, as appropriate. The president shall have the responsibility to recommend to the board appointment and, if necessary, removal of chancellors of each of the system campuses. Additionally, a special vice-president for desegregation compliance, whose mission is to oversee implementation of the Court's plan, shall be appointed by the board upon the recommendation of the president. This special vice-president shall be responsible for developing and implementing other desegregation proposals approved by the board; for compiling data on all aspects of desegregation in Louisiana public higher education; and for reporting to the monitoring committee as hereinafter required.

6. Within 120 days after the Implementing Date, the board shall develop and implement procedures for the use of advisory committees at each state university and community college. Among their duties, these committees shall provide advice and assistance to the president and the vice-president for desegregation compliance, as requested. The size of these advisory committees shall be set by the board but shall not exceed 17 members. All state universities shall be encouraged to form such committees which will provide non-binding advice and information about campus life to the board. Like the board, these advisory committees shall be appropriately composed to further the goals of this Order.

*Classification of State Universities*

7. Within 120 days after the Implementing Date, the board shall implement a scheme for classifying each state university according to its mission, taking into ac-

---

**58.** Once these appointments are made, there will remain five more members to be appointed for three year terms; two more members to be appointed for four year terms; and one more member to be appointed for a five year term.

count its undergraduate, graduate, and research programs and the degree of selectivity in admissions. Such classification shall be consistent with the tiers set forth below and shall be designed to reduce the number of programs statewide. The board shall be especially careful to differentiate the missions and academic programs of proximate PWIs and PBIs.[59]

8. LSU A & M shall be designated by the board as the research university in the state university system and recognized as Louisiana's flagship state institution. It shall continue to have the greatest number of graduate and research programs and shall implement the most selective criteria for admission. LSU A & M's undergraduate admissions shall be limited to the top echelon of graduating high school seniors in light of standards established by the board, with selectivity based on criteria discussed below. These selective admissions standards shall be established within 120 days of the Implementing Date and implemented for the Implementation School Year.[60] All remedial education courses shall be eliminated by the Implementation School Year.

9. The board shall also designate an intermediate level of state institutions offering significant doctoral and other graduate programs in addition to four-year undergraduate programs. These universities shall be somewhat less selective than LSU A & M, based on criteria discussion below. The selectivity standards shall be developed within 120 days of the Implementing Date and implemented for the Implementation School Year. All remedial education courses for these universities shall be eliminated by the School Years two years following the Implementation School Year. The group of intermediate doctoral institutions shall initially be Louisiana Tech,

SUBR, UNO, and USL. The board shall be responsible for developing a realistic timetable for SUBR, with the imposition of selective admissions and the development of its doctoral level programs taking no more than three years.

10. The board shall designate the remaining four-year public institutions— Grambling, Nicholls, SUNO, LSU–Shreveport, McNeese, Northeast, Northwestern, and Southeastern—as comprehensive universities which will have very limited graduate/research missions and less selective or open admissions. Within 120 days of the Implementing Date, the board shall set the admissions standards for all of these institutions with the exception of Grambling, which standards shall be implemented for the Implementation School Year. Care shall be taken to insure that at least some of these institutions move away from open admissions toward some degree of selectivity (which might be the requirement of completing a college preparatory curriculum).

11. The program transfers agreed upon by Louisiana Tech and Grambling have been implemented and no further remedy is necessary with respect thereto except as to review by the Monitoring Committee.[61]

12. Within 180 days of the Implementing Date, existing graduate programs at comprehensive universities shall be evaluated for continuance. So long as they are educationally sound and foster the desegregation goals of this Order, some discrete, non-duplicative graduate programs may be maintained.[62] Comprehensive universities may retain remedial education programs, especially if they remain open admissions institutions. However, the primary focus for remedial education shall be shifted in the future to the community colleges,

---

59. The abbreviations set forth herein refer to "predominantly white institutions" and "predominantly black institutions" as explained in the Court's Opinion and Order entered July 19, 1989, R.Doc. No. 490, 718 F.Supp. at 504.

60. In this Order, the term "Implementation School Year" means the School Year commencing in the calendar year in which the date 500 days after the Implementing Date falls. For

example, if the Implementing Date falls on or between August 19, 1992, and August 18, 1993, then the Implementation School Year shall be the 1994–1995 School Year.

61. *See* Stipulation of the Parties, *in* Special Master's Report, R.Doc. No. 460, at app. B.

62. *See, e.g.,* R.Doc. No. 490, 718 F.Supp. at 509 n. 16.

which will be solely open admissions institutions.

### Selective Admissions Standards

13. The state shall end the traditional system of open admissions to all state universities. Consistent with the classification scheme laid out above, selective admissions requirements shall be developed by the board within 120 days of the Implementing Date and implemented at selected Louisiana public universities by the Implementation School Year. Only five institutions are made selective directly under this Order (and one of them, SUBR, only after three years). The board has discretion to make further selectivity distinctions with the remaining institutions, so long as the admissions standards of the five selective schools designated herein clearly distinguish them from the remaining institutions.

14. State universities shall base admission decisions on some combination of high school grades, high school class rank, high school courses taken, personal recommendations, extracurricular activities, essays or personal statements, interviews and standardized test scores. The precise formulation of the criteria for each institution shall be approved by the new board. ACT and other standardized test scores provide valuable data. However, they should be used as admissions tools only in conjunction with other high school performance data. Primary emphasis shall be placed on high school grades, class rank, and breadth of course work undertaken.

15. Within 120 days of the Implementation Date, the board shall develop appropriate programs of high school course work that will be required for admission at each institution. In developing these requirements, the board must consult and work with the Board of Elementary and Secondary Education and the state's high schools to insure that resources are put in place to meet demand. New course work requirements must be phased in commencing with the Implementation School Year to allow high schools and students a period to adjust and shall be fully implemented by the second school year following the Implementation School Year.

16. Each state institution shall have fifteen percent of its entering class set aside for admissions exceptions. Initially, ten percent shall be used for admitting other race students (that is, black students at PWIs and white students at PBIs), with the remainder available for other institutional interest students such as athletes, students with other talents, and children of alumni. The precise mechanism for administering the admissions exceptions shall be developed by the president and the campus chancellors but the emphasis shall be fostering integration at each campus. Like selective admission standards themselves, the admissions exceptions shall be developed within 120 days of the Implementing Date and implemented for the Implementation School Year. The use of ten percent other race enrollment is acceptable. The goal is that each campus substantially increase its proportion of other race students and thus eliminate its racial identifiability; this goal demands more than ten percent other race enrollment.

### Comprehensive Community College System

17. The two-year community colleges subject to the Court's Order (LSU–Eunice, LSU–Alexandria, SU–Shreveport/Bossier City and Delgado) shall be reorganized as part of a single comprehensive community college system for Louisiana. The plan for this reorganization shall be completed within 180 days of the Implementing Date so that the community college system shall be in place by the Implementation School Year. All two-year community colleges should be incorporated into this system. The board shall also develop an appropriate name for the new system, such as "Louisiana Southern Community College System."

18. Upon recommendation of the president, the board shall appoint a special vice-president for the community college system who will report to the board through the president. This appointment shall be made within 120 days of the Implementing Date. The special vice-president shall over-

see and coordinate the affairs of all community colleges, including the appointment of chancellors at each campus.

19. The community college system vice-president and the president shall insure that, within 180 days of the Implementing Date, articulation agreements are executed between each of the community colleges and the four-year institutions for the Implementation School Year. Such agreements shall be widely advertised and shall provide for transfer of students successfully completing two-year academic degrees, although four-year institutions with selective admissions may adopt selectivity standards in admitting transfer students. The community college system shall also provide vocational and technical education and adult education, but its transfer mission, especially as it relates to minority opportunities, shall be the focus of its efforts at the outset.

20. Community colleges shall retain open admissions standards and shall emphasize remedial education courses. By the year following the Implementation School Year, the board shall concentrate remedial education courses in the community colleges, with no remedial courses remaining at four-year universities, with the exception of those comprehensive universities that retain open admissions.[63]

21. By the Implementation School Year, the remaining two-year programs at SUNO shall be transferred to Delgado leaving SUNO as the comprehensive four-year institution in New Orleans, with less selective or open admissions. The board shall study whether Delgado's offerings currently meet the demand for community college education in New Orleans and increase Delgado's offerings as needed. Within 180 days of the Implementing Date, the board shall review two-year course offerings at other four-year institutions to determine whether they should be continued or transferred.

22. The board shall study the need for and feasibility of starting new community colleges in the areas of the state where none currently exist. Special attention must be given to Baton Rouge, where a community college will be needed to service local students not able to be admitted at LSU A & M and SUBR, once both have selective admissions. The board shall, therefore, begin planning for a new college campus in Baton Rouge within the first year.

*Program Transfer and Enrollment Management*

23. Without exception, merger and/or closing of existing state universities need not be undertaken at this time. Instead, the board shall implement a system of enrollment management, program review, and program transfer to address the problem of program duplication and accompanying waste of resources and segregation. The board shall assign to the president the mission of reviewing all current course offerings. Within 180 days of the Implementing Date, the president shall recommend appropriate enrollment levels for each academic program and also identify programs not meeting minimal quality standards and recommend that they be eliminated or consolidated with similar programs at other state universities.

24. The board shall then take appropriate action with respect to eliminating, consolidating and setting enrollment levels for academic programs, which shall be implemented by the Implementing School Year. The board shall ensure that such action is sensitive to the desegregation goals of this plan. Thus, enrollment limits shall be set with an eye toward preventing "flight" of students to same race schools. As an example, enrollment limits at Southeastern shall be used to prevent Southeastern from becoming a "flight" school for white students not gaining admission to LSU A & M or UNO, but who are reluctant to go to SUBR or SUNO.

25. The program transfers agreed upon by Louisiana Tech and Grambling shall be implemented by the Implementation School Year. Like other programs, however, these programs are subject to further eval-

63. *See supra* ¶ 12.

uation by the board and the monitoring committee, and since the Special Master no longer has jurisdiction over this case, any changes in the stipulation's proposals shall be submitted to the board. The details of the Louisiana Tech/Grambling transfers are contained in the stipulation attached as Appendix B to the Special Master's Final Report, which provisions the Court adopts as a part of its Order, to the extent such provisions and their implementation are consistent with this Order.

### Louisiana Law Schools

26. The LSU Law Center shall undertake as soon as practicable, but no later than the Implementation School Year, vigorous efforts to recruit black and other minority students from inside and outside the state. These efforts shall include, but should not be limited to: (1) the establishment of a ten percent admissions exception for minority students; [64] (2) the continued enhancement of scholarships, tuition waivers, and other forms of financial assistance specially designed to attract minority students to the LSU Law Center; (3) the appointment by the Chancellor of the LSU Law Center of a special admissions officer for minority students whose sole function will be to develop, coordinate, and implement recruitment programs and strategies to be directed towards potential minority applicants; and (4) the continued enhancement and development of curriculum and non-curriculum related programs designed to assist minority students with any academic and social adjustments that might be required to ensure their successful comple-

tion of the juris doctoral program at LSU Law Center.

Southern Law Center shall continue *and* expand its recent efforts, as set forth in the state defendant's proposed remedial order with respect to LSU and Southern Law Centers, and shall proceed as specifically detailed therein, to ensure that the school remains in compliance with ABA standards for legal education.[65]

### Funding for Implementation of this Order

27. Taking into consideration funds freed by the elimination of duplicative programs, the board, in conjunction with the president and staff, shall develop budgets for the newly reclassified institutions, including non-formula expenditures for improving the quality of PBIs whenever fiscally possible. Capital needs shall be evaluated on a similar basis and priority given to those facilities that will support programs to attract other race students. The board shall complete this task within 180 days of the Implementing Date in conjunction with the Implementation School Year higher education budget submission.

### Other Race Recruitment and Retention

28. The board shall develop a coordinated program for recruitment and retention of other race students, faculty, administrators, and staff at all state universities and professional schools within 120 days of the Implementing Date. The program shall include:

---

**64.** In applying the admissions exception, preference should be given to minority and black students who are residents of the state. However, if the in-state applicant pool for any particular year lacks the requisite number of minority applicants whose objective academic credentials indicate a reasonable likelihood of success in the academic program at the LSU Law Center, out-of-state minority and black applicants shall then be considered under the admissions criteria used for in-state minority and black applicants in order to achieve the stated goal of ten percent.

The Court is by no means imposing a "quota" with regard to minority students. Rather, the ten percent admissions exception constitutes a

reasonable goal to be attained within a reasonable period of time. Upon attaining minority enrollment of ten percent, the Court will entertain a motion for an upward adjustment of the exception to a figure representative of the minority population in the state of Louisiana. The Court stands by its prior discussion with regard to the issue of exceptions in which it stated: "It was not the Court's intent that the figure of ten percent be deemed immutable or unchangeable in the inevitable change of circumstances.... Instead, the provision is merely a useful starting point in the process of shaping a remedy." 718 F.Supp. at 530.

**65.** *See* R.Doc. No. 599.

### (a) Scholarships for Other Race Students

A program of scholarships designed to attract other race students to both PWIs and PBIs shall be developed by the board. A fixed percentage of each institution's overall budget shall be set aside for this purpose by the board upon recommendation of the president. Moreover, the board shall establish a state-wide other race scholarship program.

### (b) Other Race Admissions Officers

Each PWI and PBI shall have at least one admissions officer whose sole function is to recruit other race students. Such person shall be charged with developing, coordinating, and executing all of the institution's other race student recruitment programs.

### (c) Equal Opportunity Statements

Each institution shall develop a strong, written equal opportunity policy, both as to students and employees. This policy shall be reviewed by the special vice-president for desegregation compliance and approved by the board.

### (d) Public Information Efforts

Under the direction of the board, each affected institution shall develop and implement significant campaigns for disseminating to prospective students and employees information about each state university, its programs, and its equal opportunity policy. Among other things, public information efforts shall include the use of biracial recruiting teams from each PBI and PWI which shall visit high schools in their region and throughout the state, as appropriate.

### (e) Developing Relationships Between High Schools and Colleges

The board shall identify state institutions particularly situated to benefit from special outreach programs to high schools in predominantly other race areas. Such programs shall be designed to reduce the

strangeness and alienation students often associate with other race institutions. Programs shall include summer sessions in which high school students live on campus and are familiarized with a university's programs and facilities. A pilot project shall be commenced at Southeastern for the summer preceding the Implementation School Year.

### (f) Incentives

The board shall set annual integration progress goals for each institution which are demanding yet realistic, and which require roughly equivalent progress at each institution. The board shall develop financial incentives for institutions that meet or exceed their annual goals. Financial rewards might include additional funds for scholarships or approval for new program offerings. Incentives shall increase by the degree to which the goal is exceeded. The board shall also consider employing "reverse incentives" or taxes for institutions which consistently fail to meet their goals.

### *Monitoring Committee*

29. A three-member committee shall monitor progress toward desegregation. The committee shall consist of (1) Dr. Martin D. Woodin; (2) Dr. Frank E. Vandiver; and (3) Dr. Franklyn G. Jenifer.[66] Committee members shall be paid a reasonable per diem and expenses, with Dr. Woodin and Dr. Vandiver's per diem and expenses to be taxed as costs against the State of Louisiana to be allocated to the budgets of the various institutions as the new board deems appropriate. Dr. Jenifer's per diem and expenses will be paid by the United States.

30. The monitoring committee is hereby charged with independently evaluating the progress of the new board and each institution, including Southern and LSU Law Centers, towards specific compliance with this Order and with the overriding desegregation goals set by this Order. Copies of the

66. If for any reason whatsoever any of the aforesaid initially decline, or subsequently are unable to continue, to serve or resign from the Monitoring Committee, then the Court shall appoint a substitute member.

minutes of all meetings of the new board shall be sent to the members of the monitoring committee within one week of each board meeting. The committee shall meet with the new board at least four times per year, and within one week after each meeting of the board and the committee, the committee shall file a report to the panel. The first meeting of the new board and the committee shall take place within ninety days of the appointment of the new board.

The committee's reports shall specifically advise the panel of the progress or lack of progress towards achieving desegregation. Each member shall have access to the Court at all times, provided such person communicates to the Court in writing, files a copy of any such communication in the record of these proceedings, and sends a copy of any such communication to the other committee members.

At least in the early stages of implementation, the monitoring committee shall be available to review and respond to decisions of the new board on an "as needed" basis.

31. The monitoring committee shall give the new board a period of five years to achieve substantial progress toward eliminating the racial identifiability of Louisiana's universities. If, at the end of five years, substantial progress is not shown, the committee shall recommend to the Court more direct solutions, including Court appointment of board members or direct control by the committee of the system of higher education and merger of institutions. However, nothing stated herein shall be construed as a divestiture of this Court's continuing jurisdiction to take appropriate action to enforce this Order.

### Interim Procedures

32. As previously indicated, the board shall be appointed and confirmed within sixty days of the Implementing Date. As each board member is appointed, the Panel shall be advised of such appointment by letter and shall be provided with a copy of such person's curriculum vitae.

If, after the Implementing Date, the Governor foresees that all board members will not be appointed and confirmed within the required time period, the Governor shall submit to the Court a proposed timetable for completing the board selection process under the guidance of the monitoring committee. If the committee deems it necessary, it may recommend to the Court names of members to serve on the board. The Court reserves the right to make any appointments necessary to complete the composition of the board in a timely fashion or to veto the appointment of any board member.

33. The board shall assume responsibility for managing the state university system and implementing this remedial Order as soon as it is formed. While its first responsibility is to search for and appoint a system president, the board should immediately appoint an interim president. The interim president shall serve until the president is selected, in order to insure that centralization of control occurs forthwith and that the steps to be taken during the first year of the Order are not delayed. The board should have the full authority of the state, through the Governor and other state officials, to carry out its mandate. Any questions that arise during the interim period regarding implementation of this plan may be directed to the monitoring committee and by the committee to the Court, if necessary.

### Supplemental Provisions

34. The board shall immediately desegregate the staffs and faculties of all public institutions by implementing at each state institution aggressive recruitment of qualified other race employees and nondiscriminatory assignment policies, as set forth below: [67]

(a) The board shall require each institution to take affirmative steps to recruit and

---

**67.** The matters set forth in item 34 generally reflect a clarification requested by the United States of America and by the Southern Board of Supervisors. The specific matters set forth in subsections (a) through (d) were adopted from the United States' Proposed Plan, R.Doc. No. 325, at pp. 23–25.

hire qualified other race faculty, staff, and administrators. The board shall be committed to making outreach efforts where the proportion of black administrators, faculty, and staff employed at each predominantly white public institution of higher education and staff employed by each higher education board is different from the proportion of black individuals with the required credentials in the relevant labor market area. The predominantly black institutions shall also continue outreach efforts to increase their proportion of other race staff and administrators. Each institution shall, within 120 days of the Implementing Order, develop a plan for recruiting qualified other race faculty, administrators and staff, taking into account the relevant labor market date for each category of positions and documenting the date used as part of the aforementioned plan, and shall provide said plan to the board and the monitoring committee.

(b) Institutions' affirmative efforts shall include advertising in professional journals, such as the "Chronicle of Higher Education," and local newspapers, and initiating contact with universities nationwide concerning vacancy announcements.

(c) All state institutions shall take all reasonable nondiscriminatory steps to increase the number of qualified other race persons among its part-time and full-time faculties, professional administrators, and support staff positions through employing, training, and promoting qualified other race persons as vacancies occur and new positions are created.

(d) Each state institution shall make a good faith effort, in addition to its existing recruitment activities, to identify qualified other race persons living and/or working within a reasonable distance of the institution who are interested in teaching on a part-time basis at the institution. Each institution shall consider the following persons: professionals; school teachers and administrators; and persons employed by businesses within a reasonable distance of the institution, who are qualified to teach

the courses involved. In attempting to identify persons who may be interested and available for part-time employment with the institution, each institution shall seek the assistance of professional associations, community groups, businesses, and elementary and secondary school officials.

The utilization of part-time faculty shall be consistent with accreditation requirements and the needs of the institutions, and no qualified applicant shall be denied such a position on the basis of race.

35. The four governing boards shall cease operation and their powers to be consolidated into a single board no later than thirty days after the Implementing Date, or if no single board is appointed and ratified by that time, immediately upon appointment of the single board by the Court in conjunction with the monitoring committee.[68]

36. The reports of the monitoring committee shall be filed in the record and the Clerk of Court shall mail copies of the report to all trial attorneys of record. The parties shall review each of the monitoring committee reports and file with the Court and mail to each of the committee members within thirty days after the monitoring committee report is filed with the Clerk any comments about progress or lack of progress in achieving desegregation.

If, upon reviewing a particular report, any party has concerns which it expresses in writing, such party or parties may meet with the monitoring committee for the purpose of discussing its concerns and offering any suggestions it may have on how problem areas may be addressed. Should such concerns not be resolved amicably, such party or parties may petition the Court for the purpose of convening a status conference and scheduling a hearing, if necessary.[69]

37. The Court's Injunction and Orders shall remain in effect until December 31 of the seventh year following the calendar year of the Implementing Date unless the plaintiff and/or another party by motion

---

68. This clarification is made at the request of the United States.

69. The clarifications set forth in item 36 were requested by the United States.

filed prior to that date request the Court to conduct a hearing for the purpose of determining whether the defendants have fully complied with the Court's Orders and/or whether or not the case should be dismissed and/or whether or not additional relief is warranted. In such a hearing, the burden shall be upon movant to prove by a preponderance of the evidence that the objectives of the Order have or have not been achieved and/or continued and/or that additional relief is required. If that burden is carried, this Court shall enter such further Orders as are appropriate. If that burden is not carried, jurisdiction shall be terminated and the action shall be closed and dismissed with prejudice.[70]

The Clerk of Court shall enter this remedial order as the judgment herein.

### ORDER AND REASONS DENYING RECONSIDERATION

#### January 20, 1993

### I. INTRODUCTION

On December 23, 1992, the Court reinstated its prior order in this desegregation case granting summary judgment in favor of the United States and against the state of Louisiana.[1] Accompanying the opinion was an order setting forth the Court's final remedial plan in this matter.[2] The United States in a Motion for Reconsideration and to Alter or Amend Judgment has now asked the Court: (1) to make further factual findings in support of its December 23, 1993 ruling as well as (2) to clarify and amend specified portions of the accompanying order. The motion was set for hearing on January 20, 1993, but was submitted on the briefs. For the reasons stated herein, the Court holds that the factual findings contained in its prior opinion are sufficient to sustain its determination with respect to the state of Louisiana's liability in this matter. The Court further finds that the Unit-

ed States' requested clarifications of and amendments to the Court's remedial plan are either unnecessary or premature in view of the framework and plain language of the Court's order. The United States' Motion for Reconsideration and to Alter or Amend Judgment is therefore DENIED.

### II. RECONSIDERATION OF THE OPINION

The United States' only request relative to the December 23, 1992 opinion is that it be amended to include further findings of fact with respect to whether current state policies promoting de facto segregation are traceable to the de jure system of years past. The Court, however, finds that the proposed amendment is unnecessary in light of the following definitive findings appearing in its latest opinion:

> (1) The state of Louisiana continues to act through its policies and practices in a manner that promotes segregation within its higher education system; (2) those policies and practices are traceable to Louisiana's long history and endorsement of segregation; and (3) Louisiana's policies and practices are without sound educational justification and can be practicably eliminated.[3]

These findings are supported by the entire record in this matter as well as by the Court's prior findings of fact which it adopted by reference in the December 23 opinion.[4]

On numerous occasions, this Court has found that Louisiana has consistently failed to adopt policies which would "convert its white colleges and black colleges to just colleges."[5] When it made these findings, the Court also observed that the path chosen by Louisiana was an officially sanctioned bid to maintain the system of higher

---

**70.** The matters set forth in item 37 are based upon the United States' Proposed Plan, R.Doc. No. 325, at pp. 34–35.

**1.** Opinion and Order at 1152–60.

**2.** *Id.* at 1160–69.

**3.** *Id.* at 1159 (citations omitted).

**4.** *Id.*

**5.** *United States v. Louisiana,* 692 F.Supp. 642, 658 (E.D.La.1988) (quoting *Norris v. State Council of Higher Education for Virginia,* 327 F.Supp. 1368, 1373 (E.D.Va.), *aff'd sub nom, Board of Visitors of the College of William and Mary v. Norris,* 404 U.S. 907, 92 S.Ct. 227, 30 L.Ed.2d 180 (1971) (per curiam)).

public education as it has always existed—a system where a student attends a particular school not because of the quality of the education available at the institution but because it is where others of his or her race have pursued their undergraduate and graduate studies.[6] In so doing, the Court established the requisite link between the policies of the past and the policies of the present. Thus, the United States' concern that the Court did not make findings relative to whether current policies are traceable to the de jure system of prior years is unfounded, and it would be superfluous to reinvestigate the issue or alter the opinion in the manner suggested by the United States.

## III. RECONSIDERATION OF THE ORDER

Given the nature of the United States' proposed amendments to the remedial order, the Court finds it necessary to preface its discussion of the same with a short statement as to the manner in which the implementation of its remedial plan shall proceed. The remedial plan is "a comprehensive solution to the desegregation case with room for adjustment at the margins."[7] In implementing the plan, the parties must encourage a steady and undeviating path toward the constitutional ends envisioned by the plan. Perpetual negotiations and posturing by the attorneys with respect to the intent of the order when that intent is obvious will only serve to keep the higher education system in Louisiana in a state of flux.[8] It is expected therefore that, after the plan takes effect, the parties

will "devote more energy to education and less to litigation" by acting in accordance with the high professional standards associated with institutions of higher learning.[9]

In order to make this adjustment, it is expected and an implicit command of the order that the parties will engage in a heightened level of cooperation while being mindful of the demands and efforts of the others. For their part, the State, the governing board, and the various other institutional actors must not only abide by the specific terms of the remedial plan but must also be cognizant of its overall intent and that the Government and monitoring committee are now their partners in ensuring that the objectives of the plan are consummated.[10] The Government, on the other hand, must allow the administrative boards and individual institutions to conduct the day to day management of the schools free from needless interference. Finally, the parties should be aware that, although the Court believes the implementation of this plan will lead to a period of calm in this case, the Court retains jurisdiction over this matter and will not hesitate to intervene in the event one party attempts to supersede the interests of another.[11] With this in mind, the Court will now address the United States' specific objections to the remedial plan as it was set forth this past December.

First, the United States seeks to have the remedial order amended to explicitly require the State to submit "all newly proposed procedures, policies, and other changes mandated by the plan ... to the

---

6. *See, e.g., Id.* at 657–58; *id.* at 657 ("In failing to achieve a truly unitary system at the higher level of public education, the State continues to provide polarization and separation on a racial basis."); *cf. id.* at 656 n. 69 (comparing Louisiana's present policies with that of Mississippi).

7. *Little Rock School District v. Pulaski County Special School District No. 1,* 769 F.Supp. 1491, 1494 (E.D.Ark.1991).

8. *See id.* Although the parties in the *Little Rock* case were in a different procedural posture than the parties in this matter, the *Little Rock* court's comments with respect to how the parties in that matter were expected to proceed in their efforts to implement a desegregation settlement

agreement were found by this Court to be reasonable and insightful.

9. *Id.* at 1495 (quoting *Little Rock School District v. Pulaski County School District No. 1,* 921 F.2d 1371, 1394 (8th Cir.1990)).

10. As stated later in this opinion, the state defendants must be especially aware of their responsibility to ensure that their efforts can be monitored and reviewed with relative ease and convenience. As another Court once stated, "[p]lans which cannot be monitored cannot be enforced." *Id.*

11. Opinion and Order at 1168–69, ¶ 37.

United States for its review and comments prior to implementation." [12] In the Court's view, however, the requested amendment is unnecessary as the continuing participation of the United States in overseeing the implementation of the plan is an implicit and essential component of the order. The remedial order must be viewed by all parties as an ongoing process which entails and demands cooperation and collaboration among the individual state entities and the Justice Department. It is thus expected that the State will avoid the need for continual hearings in this matter by providing the Government with *all* substantive proposals generated by its institutions with sufficient time for the Government to have an adequate opportunity to review and comment on those proposals prior to implementation. For its part, the Government shall review and comment on said proposals with sufficient speed to avoid disrupting the timetable set forth in the remedial plan.

The second clarification requested by the United States is for the Court to substitute the term "graduate programs" as it used in paragraph twelve of the order with the words "masters and doctoral programs." [13] The Government believes for unspecified reasons that the term is likely to cause confusion. The Court, however, finds that the term "graduate program" is commonly understood as referring to specialized studies extending beyond a baccalaureate de-

gree; the meaning it is obviously assigned in paragraph twelve. Furthermore, the term is not readily susceptible to any other meaning given the context in which it is used. As such, the requested clarification is unnecessary.

The Court also rejects as unwarranted a proposed amendment which would insert language in the order explicitly requiring that the advisory committees make all substantive recommendations to institutional officials in writing. [14] The remedial plan was designed in part to permit flexibility in the day to day management of the higher education system. If the Court were to begin to insert itself in the daily activities of the advisory committees and other educational divisions by prescribing the exact fashion in which they are to conduct their work, the flexibility envisioned by the plan would be nothing more than a false hope. Moreover, the Court assumes that the various advisory committees and administrative groups will act as other professionals in education and business by observing generally accepted standards of record keeping. A comprehensive system of records would, of course, necessarily include transcripts or copies of the written text of all substantive proposals and recommendations.

The hesitancy of the Court to interfere with the daily operations of the university system make it equally suspect of the United States' proposal that the remedial plan

---

**12.** United States Motion for Reconsideration and to Alter or Amend Judgment, R.Doc. No. 611. The United States makes specific reference to the state action required under paragraph numbers 6, 7, 9, 10, and 12–17.

**13.** Paragraph twelve reads as follows:

Within 180 days of the Implementing Date, existing graduate programs at comprehensive universities shall be evaluated for continuance. So long as they are educationally sound and foster the desegregation goals of this Order, some discrete, non-duplicative graduate programs may be maintained. Comprehensive universities may retain remedial education programs, especially if they remain open admissions institutions. However, the primary focus for remedial education shall be shifted in the future to the community colleges, which will be solely open admissions institutions.

Opinion and Order at 1162–63 (footnote omitted).

**14.** The Government makes specific reference to paragraph six of the remedial plan:

Within 120 days after the Implementing Date, the board shall develop and implement procedures for the use of advisory committees at each state university and community college. Among their duties, these committees shall provide advice and assistance to the president and the vice-president for desegregation compliance, as requested. The size of these advisory committees shall be set by the board but shall not exceed 17 members. All state universities shall be encouraged to form such committees which will provide non-binding advice and information about campus life to the board. Like the board, these advisory committees shall be appropriately composed to further the goals of this Order.

*Id.* at 1161.

be amended to delineate the recruiting procedures and requisite credentials relative to the appointment of a special vice-president for desegregation compliance as required under paragraph five of the plan.[15] The United States believes that the position requires someone with previous administrative experience as well as someone who has had experience in the implementation of equal opportunity programs. The United States also argues that the governing board should be required to conduct a national recruitment campaign which would include advertising in national publications. With respect to these proposed amendments, the United States again seeks to have the Court engage itself in the day to day operations of the higher education system. As stated previously, the Court views such interference as being contrary to the intent of the plan. The Court is confident that the governing board will proceed as any other state university system would when seeking to fill a position whose importance to the reputation and continuing viability of the school is implicit in its title.

The United States next proposes that the Court assign the new governing board with the responsibility of determining which re-medial and support type programs should be eliminated from the selective admission institutions pursuant to paragraphs eight and nine of the remedial plan.[16] The United States suggests that the review of remedial programs be made part of the program review required of the governing board under paragraph twenty-three of the plan.[17] Paragraph twenty-three presently compels the board to review all programs in the various state institutions to address program duplication and the accompanying waste of resources. The board is also charged with assigning the President the responsibility of reviewing all current course offerings. Since remedial programs are among the many programs that have been duplicated among institutions in close proximity, their review is already mandated by paragraph twenty-three, and the United States' concerns are unwarranted.[18]

The final two amendments proposed by the United States concern institutional budgets. First, the United States suggests that the governing board be required to conduct a review of the programs and facilities at traditionally black institutions to identify areas of insufficient and historical-

15. Paragraph five states, in relevant part, the following:

> Additionally, a special vice-president for desegregation compliance, whose mission is to oversee implementation of the Court's plan, shall be appointed by the board upon the recommendation of the president. This special vice-president shall be responsible for developing and implementing other desegregation proposals approved by the board; for compiling data on all aspects of desegregation in Louisiana public higher education; and for reporting to the monitoring committee as hereinafter required.

> *Id.* at 1161.

16. The relevant portions of paragraphs eight and nine read as follows:

> 8. LSU A & M shall be designated by the board as the research university in the state university system and recognized as Louisiana's flagship state institution.... All remedial education courses shall be eliminated by the Implementation School Year.
> 9. The board shall also designate an intermediate level of state institutions offering significant doctoral and other graduate programs in addition to four-year undergraduate programs.... All remedial education courses for these universities shall be eliminated by

the School Years two years following the Implementation School Year....
*Id.* at 1162.

17. Paragraph twenty-three reads as follows:

> Without exception, merger and/or closing of existing state universities need not be undertaken at this time. Instead, the board shall implement a system of enrollment management, program review, and program transfer to address the problem of program duplication and accompanying waste of resources and segregation. The board shall assign to the president the mission of reviewing all current course offerings. Within 180 days of the Implementing Date, the president shall recommend appropriate enrollment levels for each academic program and also identify programs not meeting minimal quality standards and recommend that they be eliminated or consolidated with similar programs at other state universities.

> *Id.* at 1164.

18. The required review is set to be completed within 180 days of the implementation date. This leaves the universities that are required to eliminate remedial programs ample time to eliminate those programs before the stated dates.

ly disparate funding. Moreover, the United States proposes that the State be required to develop a budget to correct the same. Lastly, the United States argues that each institutional budget should be required to specifically identify formula and non-formula funds to ensure effective monitoring of state resource allocations. The requested amendments, however, are uncalled for as the remedial plan presently takes the United States' concerns into account. Paragraph twenty-three currently obliges the governing board to conduct a program review of all institutions including historically black institutions.[19] That program review will necessarily involve consideration of the facilities available at each school. Moreover, the governing board is directed in paragraph twenty-seven to develop budgets for the various state institutions.[20] As part of the budgetary process, the board is responsible for setting aside non-formula expenditures to improve facilities at historically black colleges as well as for prioritizing the capital needs of those institutions. Furthermore, it is part of the monitoring committee's charge to bring to light any failure on the part of the State to develop budgets and allocate resources in accordance with the intent of the plan. No doubt the Government representative on the monitoring committee will, if the occasion should arise, bring such matters to the Court's attention. As such, the United States' concerns with respect to the future budgetary allocations to the various state institutions are premature.

On the other hand, it is true that the monitoring committee would be hampered without access to specific budgetary information such as a breakdown of formula and non-formula allocations. The Court, however, finds it unnecessary to dictate the specific manner in which the institutions and the State present their budgets as it is confident that both will assist the monitoring committee in its efforts by ensuring that institutional budgets include a break down of all funding sources necessary for a thorough and convenient review. Lastly, if this information is not provided amicably, the monitoring committee has access to the Court to petition for relief.

## IV. CONCLUSION

In a preliminary statement introducing the remedial plan, the Court set forth the plan's parameters when it stated that the plan was "a considered effort to reconcile innumerable interests and provide specification of enforceable guidelines for ending desegregation in Louisiana's higher education system while at the same time permitting flexibility in its day to day management." The parties must remember that compliance will not come from conduct which abides by the letter of a particular provision. Rather each of the edicts contained therein must be considered in the context of the agreement as a whole. In conclusion, the Court rests well-assured that, with the good faith efforts of the parties, compliance and the significant relief envisioned by the remedial plan are at hand.[21] Accordingly,

IT IS ORDERED that the United States' Motion for Reconsideration and to Alter or Amend Judgment is hereby DENIED.

---

**19.** *See supra* note 17.

**20.** Paragraph twenty-seven reads as follows:
   Taking into consideration funds freed by the elimination of duplicative programs, the board, in conjunction with the president and staff, shall develop budgets for the newly reclassified institutions, including non-formula expenditures for improving the quality of PBIs whenever fiscally possible. Capital needs shall be evaluated on a similar basis and priority given to those facilities that will support programs to attract other race students. The board shall complete this task within 180 days of the Implementing Date in conjunction with the Implementation School Year higher education budget submission. Opinion and Order at 1165.

**21.** To clarify any confusion with respect to the effect of the Government's post-judgment motion upon the implementing date of the remedial plan as it is defined in footnote fifty-six of the Court's Opinion and Order, the Court notes that in light of the Government's post-judgment motion the implementing date has been pushed back, as a matter of law, to thirty-five days from the entry of this order.